STATE OF WEST VIRGINIA

*v.*

ROBERT RAYMOND BARKER

(No. 9797)

Submitted April 9, 1946.   Decided April 30, 1946.

*John Q. Hutchinson,* for plaintiff in error.

RILEY, JUDGE:

In this criminal case the defendant, Robert Raymond Barker, was indicted at the October, 1944, term of the Criminal Court of Raleigh County for having, on September 30, 1944, "feloniously, wilfully, maliciously, deliberately and unlawfully" slayed, killed and murdered one Fern Palosi. Defendant was found guilty of the charge of voluntary manslaughter and sentenced to the penitentiary for a term of one to five years. This writ of error is prosecuted to a judgment of the Circuit Court of Raleigh County, refusing to grant defendant a writ of error and supersedeas.

The defendant, a soldier in the United States Army, who had spent a number of months in foreign service, went to Beckley on an emergency furlough to visit a sister who had been confined in Pinecrest Sanitarium located in that city. He arrived in Beckley on July 21, 1944, and found that his sister had died. On that day he rented a room in the vicinity of Cottage Inn, which was operated by one Joe Menenghetti. On the following day, about seven o'clock in the evening, he and a sailor, who was not available for the trial, went to the Inn, and each ordered sandwiches and beer. Shortly thereafter the decedent, Fern Palosi, and Geneva Underwood, dressed in Marine uniforms, entered the Inn, seated themselves in a booth in the dining-room, and ordered sandwiches and beer. One of the girls, Geneva Underwood, called defendant an abusive name, whereupon he struck her, knocking her to the floor, where she remained in an unconscious condition for some time. The proprietor then ordered defendant and his companion to leave the restaurant, instructing one of his employees at that time to call the State Police, but the altercation between defendant and decedent continued outside the Inn. As the

men were leaving, decedent followed defendant and continued to "fuss" with him, evidently for the purpose of delaying him until the arrival of the State Police. Defendant and two other witnesses testified that decedent had some object in her hand, but Menenghetti testified that decedent had nothing in her hands when she left the Inn. Defendant testified that he held up his hands to prevent decedent from striking him with the object which he says decedent had in her right hand, and that he struck her with his right hand causing her to fall to the ground. According to the testimony of defendant and Pauline Clayton, a witness for the state, defendant struck decedent once, but, according to the testimony of Imogene Layton, also a state witness, he struck her two or three times. Decedent fell backwards striking her head on a stone or other hard object at or near the walkway leading from the restaurant.

According to defendant's testimony he went to a park in the rear of a nearby cottage after the altercation, where he remained about a half an hour before the State Police arrived and arrested him. Trooper Milam, the arresting officer, testified, and defendant denied, that when the Trooper started to search defendant the latter said, "* * * take your damn hands off me. I have been taught to kill, and I will kill anyone who touches me." At the time of his arrest, defendant had, according to Milam, a quart bottle of liquor partially consumed and was under the influence of intoxicating liquor; but defendant says that at the time of the difficulty he had taken only part of a bottle of beer and was not intoxicated. He attributes his condition of intoxication at the time of his arrest to the fact that during the half hour he was in the park, he took three or four drinks from the bottle. No witness testified that defendant or his companion was intoxicated at the time of the altercation; but there is subsantial evidence to the effect that both decedent and the Underwood girl were intoxicated—in fact, Geneva Underwood so testified as to herself.

After defendant had left the Inn, Geneva Underwood, who, having been revived from her unconscious condition, left the scene of the altercation with decedent. According to Geneva Underwood's testimony, which is corroborated by that of the proprietress of the place where the girls stayed that night, they went to their dwelling place about nine or nine-thirty at night and retired shortly thereafter. However, there is substantial evidence to the effect that decedent and her companion were seen at a place, known as Dutch Villa, about midnight of that night where both girls were drinking. The next morning decedent was taken to the Beckley Hospital, where she was examined, and an X-ray disclosed that she had multiple fractures at the base of her skull.

After leaving the Beckley Hospital, decedent took a train to Cleveland to visit her cousin, Garnet Frederick, who met her at the train in that city on July 24, and took her to the Frederick home. Three days later decedent was taken to a hospital in Cleveland, where she went into a coma on August 6, 1944, and died shortly thereafter. An autopsy was performed in Cleveland shortly after her death, which disclosed a diffused hemorrhage at the base of the brain, and multiple fractures at the base of the skull. Dr. Gerber, the physician who assisted in the autopsy, testified that the hemorrhage was sufficient to have caused decedent's death.

Six points of argument in support of seven assignments of error are advanced here. They will now be considered *seriatim*.

Defendant urges as his first point of argument that the circuit court erred in permitting improper evidence prejudicial to him to go to the jury over defendant's objection. It is argued that it was error to have permitted Trooper Milam to testify as to the threat purported to have been made by defendant against the officer at the time of defendant's arrest. This purported threat is in the sequence of events from the time the difficulty be-

tween defendant and the two girls started until the arrest was consummated. The evidence tends to show the defendant's mental attitude. It is a part of the evidence shortly succeeding the striking of the blow which the State urges caused decedent's death, and if, as counsel for defendant suggests, the alleged threat has no reference to the main incident itself, it did not, in the instant case, tend to prejudice the jury. Defendant further argues in support of the first ground of argument that the hypothetical question propounded to Dr. Gerber was objectionable because it contained the assumption that decedent "was not otherwise injured from the time she was injured as Judge Crouse asked you about, at the time she was knocked out on the lot there", an assumption not proved. More than two weeks had elapsed from the time decedent received her alleged fatal injury until her death in Cleveland on August 8, 1944. The action of the court in overruling defendant's objection to this hypothetical question, in our opinion, was prejudicial error. Likewise, the trial court committed prejudicial error in overruling the defendant's objection to a hypothetical question addressed to Dr. Tieche. This question contained the assumption, not proved, that decedent received no injury from the time Dr. Tieche saw her at the Beckley Hospital on July 23, 1944. The record does not disclose what, if anything happened to her from the time she left the Beckley Hospital until her arrival in Cleveland, and nothing in this record indicates that Dr. Tieche had any personal knowledge concerning decedent after his examination of her. We, however, see no error in the court's permitting Mrs. Dewey Farley and Geneva Underwood to testify on rebuttal as to the actions and conduct of decedent after her injury on July 22, 1944. The conduct of a trial is within the sound discretion of the trial court and to a large extent the trial court has full control of the order in which evidence is to be introduced. *State v. Weissengoff*, 89 W. Va. 279, 109 S. E. 707; *Goodwin v. Tony Pocahontas Coal Company*, 88 W. Va. 49, 106 S. E. 76; *Wills v. Montfair Gas Coal Company*, 104

W. Va. 12, 138 S. E. 749; *Keatley v. Hanna Chevrolet Company,* 121 W. Va. 669, 6 S. E. 2d 1. And, finally, under this first ground of argument, we do not think the trial court erred in stating from the bench what had been reported to him about the rule issued for one Perdue, who was shown to have been present during the altercation between defendant and decedent. This statment by the court did not, in our opinion, tend to prejudice the jury.

Under the second point of argument defendant urges that the court erred in refusing to permit Menenghetti, the proprietor of the Inn, to testify that decedent was under the influence of liquor at the time she was injured, and the refusal to permit Geneva Underwood to testify to the same effect, was prejudical error. Whether decedent was intoxicated does not bear materially upon the issue as to whether her actions toward defendant were such as to justify his striking her as he did, and, in our opinion, the refusal of the court to permit these witnesses to testify was not prejudicial error. Under this point of argument counsel for defendant urges that the trial court erred in refusing to permit the witness, Geneva Underwood, to testify that on the day after decedent was injured, the latter told the witness that "they were all at fault". This statement is too remote in point of time to be admissible as a part of the *res gestae.* In *O'Boyle v. Commonwealth,* 100 Va. 785, 40 S. E. 121, it was held that where the evidence showed that deceased came to her death from blows, it was proper to exclude as hearsay the testimony of a witness to the effect that, on the morning after the day of the killing, deceased had stated to the witness that she had fallen that morning and struck herself on a bedpost, and that she was then suffering pain from the injury. The Virginia court held, and we think properly so, that the statement of the deceased was not a part of the *res gestae.* Nor is the testimony admissible on the ground that the alleged statement is a dying declaration. In this State, before a dying declaration may be admitted in evidence, it must be shown that

at the time such declaration was made declarant: (1) was under the sense of impending death; and (2) had abandoned hope or expectation of recovery. 1 Lee, The Criminal Trial in the Virginias, 2d ed. Section 543. In *State v. Dotson*, 96 W. Va. 596, pt. 2 syl., 123 S. E. 463, this Court held: "It is improper to admit a dying declaration in evidence without proof before the jury that the declarant at the time of making the statement was *in articulo mortis* and conscious of impending death." In the instant case there was nothing to indicate that at the time the alleged statement 'was made decedent entertained any fear of death or had reason to entertain such fear. Her trip to Cleveland, which the record discloses was for the purpose of obtaining employment there, indicates otherwise.

The third point of argument is that the trial court erred in giving State's instructions Nos. B. and C. State's instruction No. B is to the effect that "there is no particular period during which it is necessary that malice should have existed or the defendant should have contemplated the homicide, if he did. If the intent to kill is executed the instant it springs into the mind, the offense is as truly murder as if it had dwelt there for a longer period." Inasmuch as defendant was found guilty of voluntary manslaughter, this instruction bearing on the definition of murder was not prejudicial. In *State v. Johnson*, 108 W. Va. 630, pt. 1 syl., 152 S. E. 203, this Court held: "Where a conviction for a lower degree of an offense is sustained by the evidence, an instruction on a higher degree, though erroneous, is immaterial." In that case defendant was tried for murder and convicted of voluntary manslaughter. See also *State v. Stanley*, 112 W. Va. 310, 313, 164 S. E. 254, and *State v. Bowles*, 117 W. Va. 217, pt. 3 syl., 185 S. E. 205. For the rule which prevailed at an earlier date in this jurisdiction, see *State v. Dickey*, 46 W. Va. 319, 33 S. E. 231, in which Judge Brannon in a dissenting opinion advocated the present rule. The instant case is to be distinguished from *State v. Laura*, 93 W. Va. 250, 116 S. E. 251, in

which this Court held that the trial court committed reversible error in instructing the jury "that there is no particular period during which it is necessary that malice should have existed, or the prisoner should have contemplated homicide. If the intent to kill is executed the instant it springs into the mind, the offense is as truly murder as if it had dwelt there for a long period". This instruction, as noted by the Court in point 4 of the syllabus, in the *Laura* case, assumed "the presence of malice in the mind of the accused". But it is to be noted that in the instant case State's instruction No. B differs from the instruction in the *Laura* case in that in telling the jury that "there is no particular period during which it is necessary that malice should have existed, or the defendant should have contemplated homicide", it added the qualifying words "if he did". But we think the giving of State's instruction No. C constitutes prejudicial error. This instruction told the jury that "a man is presumed to intend that which he does, or which is the immediate and necessary consequence of his act". This instruction assumes that defendant when he struck the allegedly fatal blow is presumed to have intended to kill decedent, which, as we shall discuss under the fifth and sixth points of argument, is not supported by the evidence. Because the jury found that defendant was guilty of voluntary manslaughter, an essential element of which is intent to kill, it may be that the jury was prejudiced by the giving of this instruction, and, under the rule that in a criminal case the giving of an erroneous instruction upon which the jury may have relied is presumptively prejudicial, we must hold that the court's action in giving State's instruction No. C constituted reversible error. *State v. McCoy,* 63 W. Va. 69, pt. 4 syl., 59 S. E. 758.

And, finally, defendant alleges as his fifth and sixth grounds of error that the verdict is against the great weight and preponderance of the evidence, and that the evidence does not support a verdict of guilty of voluntary manslaughter. In the appraisement of these two

points of argument, it is to be noted that this record shows very little conflict in the evidence. Undoubtedly, as decedent was following defendant, when he was leaving the Inn, he struck her at least one blow which was sufficient to cause her to fall to the ground. When she struck the ground, evidently her head came in contact with a stone or some other hard object. As disclosed by the X-ray taken at the Beckley Hospital, she had multiple fractures at or near the base of her skull. In the absence in this record of anything indicating that she received an injury from the time she was struck by defendant until her admission to the hospital in Cleveland, the jury, in our opinion, had a right to find under proper instructions that decedent came to her death as the result of the blow administered to her by defendant on July 22, 1944; but there is nothing in the record which would indicate in the least that defendant intended to kill decedent. When he struck her to the ground, it was through the merest accident that her head struck an object so hard as to cause fractures of the skull. But it was for the jury to say whether defendant had the right to strike decedent with the force he used in the circumstances portrayed in this record. If he struck decedent without justification or with undue force, he did an unlawful act, and if decedent's death resulted therefrom he is guilty of manslaughter. There being, however, no intent to kill, a verdict of voluntary manslaughter will not lie. Involuntary manslaughter, as this Court held in *State* v. *Lawson,* 128 W. Va. 136, 36 S. E. 2d 26, is the unintentional taking of the life of another in the doing of an unlawful act, or the unlawful doing of a lawful act.

The discrepancy between the date of the alleged killing contained in the indictment, and the date of the alleged fatal injury, as disclosed by the record, was not brought to the attention of the Court in the assignments of error, the briefs, or the argument of counsel.

For the reasons hereinbefore set forth, the judgments of the Circuit Court and Criminal Court of Raleigh

754

County are reversed, the verdict set aside, and a new trial awarded.

*Judgments reversed;*
*verdict set aside;*
*new trial awarded.*