State of West Virginia

*v.*

Danny Duvall

(No. 12682)

Submitted January 23, 1968.     Decided March 26, 1968.

*Kay, Casto & Chaney, George S. Sharp,* for plaintiff in error.

*C. Donald Robertson,* Attorney General, *Leo Catsonis, James G. Anderson, III,* Assistant Attorneys General, for defendant in error.

Haymond, Judge:

At the September 1966 Term of the Court of Common Pleas of Cabell County, the defendant, Danny Duvall, was indicted by the grand jury of that county for the murder of Joseph J. Stender. To the indictment the defendant

entered a plea of not guilty and upon the trial the jury by its verdict returned October 25, 1966, found the defendant guilty of the crime of voluntary manslaughter. The motion of the defendant to set aside the verdict and grant him a new trial was overruled and by its judgment of January 4, 1967 the Court of Common Pleas sentenced the defendant to be confined in the penitentiary of this State for an indeterminate term of one year to five years. The Circuit Court of Cabell County, by its order of April 21, 1967, refused to grant the defendant a writ of error and to that judgment this Court granted this writ of error and supersedeas on July 10, 1967, upon the application of the defendant.

On and prior to August 12, 1966, the day of his death, Joseph J. Stender, had resided with his mother and sister in South Point, Ohio. He was unmarried, twenty-three years of age, six feet two inches in height, and weighed about two hundred pounds. He was a car salesman and enjoyed normal good health. About 10:00 o'clock that night he and two other young men, Thompson and McKibben, left South Point and proceeded to a place opposite the Surfer Club, an establishment located on Fourth Avenue near its intersection with Sixteenth Street in Huntington, which was patronized by college students and which afforded its patrons an opportunity to dance and obtain refreshments. Stender, accompanied by Thompson, entered and went to the rear of the Surfer Club where Stender drank some beer but did not become noticeably intoxicated.

Earlier that evening Mary Lou Romine, twenty-one years old, employed as an elementary school teacher, whose parents lived in South Point, had stopped at Stender's home to bid him goodbye before leaving to resume her teaching away from South Point. She and Stender were friends and had had dates together during her summer vacation in South Point.

After leaving the Stender home about 9:00 o'clock in the evening, Miss Romine came to Huntington by automobile and when she was near the Surfer Club and at the traffic light at the intersection of Fourth Avenue and Sixteenth

Street, she saw the defendant, whom she had known for about a year and a half. He was standing in front of the Surfer Club and she greeted him and shortly afterwards parked her automobile and went into the Club. The defendant followed her in and they engaged in three or four dances. Near the end of her last dance with the defendant, Stender entered the Club. Neither Stender nor Miss Romine knew or had told the other that either of them intended to visit the Surfer Club that evening, and their presence there together was merely an unplanned accidental occurrence. They greeted each other and she and Stender danced together until the music stopped a short time after they had started to dance.

The evidence is conflicting as to what happened between Stender and the defendant while they and Miss Romine were in or were leaving the Club. She testified that no trouble then occurred between Stender and the defendant and that in leaving the Club with Stender he did not push or force her to go with him, that though he placed and kept his hand on the nape of her neck he did not act in a rude or insolent manner, and that he usually acted in that way when they walked together. On the contrary, the defendant testified that Stender, whom the defendant did not know and had never before seen, grabbed his shoulder and shoved him away and pushed Miss Romine and forced her to leave the Club with him. The defendant was outside and in front of the entrance to the Club when Stender and Miss Romine came out, and according to the defendant after Stender and Miss Romine separated in the crowd Stender came to the defendant, asked him if he was waiting for Stender, "punched" the defendant and told one of the bystanders that he and the defendant "were going tofight."

David Duvall, the older brother of the defendant, who did not know Stender and had never previously seen him, who was six feet in height and weighed 210 pounds, and who had been inside the Club for several minutes, came outside and was on his way to Sixteenth Street to get his parked automobile when he encountered Stender who had come out of the Club with Miss Romine. According to

David Duvall, Stender said to him: "Fat boy, if you want some of this you can get it, too."; that David Duvall told Stender "all I want to do is to go to my car, I don't want any trouble"; that they argued and cursed each other; that at that time David Duvall did not see the defendant; that he then "flipped" his cigarette toward Stender; that the cigarette hit Stender near his forehead; that Stender "ducked" and went "to his right"; that someone then yelled and David Duvall turned and saw that Stender "ricochetted off" the shoulder of a bystander and "into the wall" of the nearby building. At that time he saw the defendant standing behind Stender but he did not see the defendant hit Stender.

Other witnesses give a different version of the fight and testified that the lighted cigarette tossed by David Duvall struck Stender in his eye and that he lowered his head and staggered to the center of the sidewalk rubbing his eye; that the defendant ran to and struck Stender a violent blow on the right side of the head with his fist; that the force of the blow almost broke the defendant's wrist; that the blow caused Stender's head to strike a projection on the nearby building and that Stender fell face down upon the concrete pavement of the sidewalk; that before Stender was struck by the defendant Stender had not made any threatening statements or aggressive gestures but had said to defendant's brother that he did not want to fight.

The defendant testified that when his brother and Stender were arguing with each other he saw Stender standing with his back against the wall of the building; that Stender said: "If both of you want me, come and get me."; that the defendant replied "We brothers don't fight that way, if you fight one of us that is it," and then turned around and "backed off"; that he left because he did not want "to get into a fight"; that he then heard a bystander say that Stender was going to hit his brother "for sure"; that he looked and saw that Stender was moving toward his brother; that Stender had dropped his hands as if he was going to hit his brother with his closed fists; that he then moved toward Stender and said "Hey, son, look out";

that he saw that Stender was ready to hit his brother; that he grabbed Stender by the arm and turned him around and struck his head and shoulder. He testified that "when I swung it went over his shoulder into the side of his head, I was just wanting to get him out of the way, my brother, I know he was going to hit him."

After Stender's head struck the building and he fell to the ground and lay in an unconscious condition, some of his friends attempted unsuccessfully to revive him by mouth to mouth resuscitation. He was taken to a hospital where he was pronounced dead upon arrival. An autopsy revealed a deep bruise at the left temple, a brain hemorrhage, and stoppage of the airways by asperated vomiting from the stomach. A pathologist testified that Stender died either from a brain hemorrhage or suffocation resulting from vomiting during attempted artificial resuscitation and that death would have resulted from either cause.

The defendant seeks reversal on this writ of error of the judgment of imprisonment rendered by the Court of Common Pleas on these main grounds: (1) The erroneous action of the trial court in giving Instruction No. 7 which incorrectly defined voluntary manslaughter; and (2) the evidence was not sufficient to establish the offense of voluntary manslaughter because it failed to show any intent to kill upon the part of the defendant.

. Instruction No. 7, given by the trial court and of which the defendant complains, dealt with the offenses covered by the indictment and the verdict which under the evidence the jury could return and instructed the jury with respect to murder of the second degree, voluntary manslaughter and involuntary manslaughter and the punishment provided by law for each offense. As to voluntary manslaughter the instruction told the jury that "Voluntary manslaughter is when one person unlawfully kills another person without malice, but under excitement and heat of passion" and that "Voluntary Manslaughter is punishable by confinement in the penitentiary of this State for an indeterminate sentence of not less than one year nor more than five years."

In some decisions and text authorities there is confusion with respect to the correct definition of the crime of voluntary manslaughter and the essential elements of that offense; and accepted definitions have omitted the element of the intent to kill upon the part of the defendant. These authorities and definitions are mentioned and discussed in the opinion of this Court in *State* v. *Foley*, 131 W. Va. 326, 47 S. E. 2d 40. In that case and in the later case of *State* v. *Reppert*, 132 W. Va. 675, 52 S. E. 2d 820, this Court held in clear and unmistakable terms that voluntary manslaughter involves an intent to kill. In a syllabus point in each of those cases this Court said: "The offense of voluntary manslaughter involves an intent to kill; and an instruction or charge to a jury defining such offense, which omits any reference to intent as an element of the offense, is presumed to have been prejudicial to a defendant being tried on an indictment under which he might be convicted of that offense, and constituted reversible error."

The definition set forth in Instruction No. 7 omits the essential element of voluntary manslaughter of the intent to kill upon the part of the defendant and the instruction, for that reason, is erroneous and prejudicial to the defendant in this case and requires reversal of the judgment of imprisonment rendered by the Court of Common Pleas on January 4, 1967.

The foregoing judgment must be reversed for the additional reason that the evidence failed to show that the defendant intended to kill Stender when he delivered the violent blow which caused his head to strike the wall of the building and resulted in his fall to the pavement and inflicted the injuries from which he died. The evidence, without the showing of such intent, is insufficient to convict the defendant of voluntary manslaughter or of any offense under the indictment other than involuntary manslaughter. *State* v. *Barker*, 128 W. Va. 744, 38 S. E. 2d 346. In that case the defendant, a soldier in the United States Army, struck a woman, during an altercation between them, one blow with his hand, according to the defendant and one witness, but two or three such blows according to another

witness, which blow or blows caused her to fall backwards and to strike her head against a stone or other hard object at or near a walkway leading to a restaurant in which the dispute in which they were engaged began. The blow or blows with the hand caused her to sustain multiple fractures at the base of her skull which about fifteen days later resulted in her death. In discussing the attack by the defendant and its fatal result in that case, this Court said: "* * * there is nothing in the record which would indicate in the least that defendant intended to kill decedent. When he struck her to the ground, it was through the merest accident that her head struck an object so hard as to cause fractures of the skull. * * *. If he struck decedent without justification or with undue force, he did an unlawful act, and if decedent's death resulted therefrom he is guilty of manslaughter. There being, however, no intent to kill, a verdict of voluntary manslaughter will not lie." Here, as in the *Barker* case, there was no intent upon the part of the defendant to kill the victim. His blow was unjustified and was delivered with undue force, but when he delivered it he had no intent to kill and it was a mere accident that Stender's head should strike a projection on the nearby building and that he should fall face down upon the sidewalk in a manner that would produce a fatal injury. When Stender was struck the fatal blow by the defendant Stender was directing his attention to the defendant's brother who in size and strength was fully capable of defending himself if necessary and Stender was not attacking or threatening to attack the defendant and in fact was not looking in his direction. In the circumstances the blow by the defendant was unnecessary, cowardly and clearly unlawful but his act in delivering the fatal blow did not render him guilty of voluntary manslaughter and his conviction and sentence for that offense, not being supported by the evidence, were erroneous and must be reversed and set aside. In a trial upon an indictment for murder in which the defendant is convicted of voluntary manslaughter and the evidence is not sufficient to justify a verdict of guilty of voluntary manslaughter, such verdict and the sentence of imprisonment

entered upon it will be set aside and reversed by the appellate court.

The final judgment of the Court of Common Pleas and the judgment of the Circuit Court refusing to grant the defendant a writ of error are reversed, the verdict is set aside, and this case is remanded for a new trial which is here awarded the defendant.

> *Judgments reversed,*
> *verdict set aside,*
> *new trial awarded.*