425 S.E.2d 823

**STATE of West Virginia, Appellee,**

v.

**Dusty Harold BEEGLE, Appellant.**

No. 20843.

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 9, 1992.

Decided Dec. 16, 1992.

**682**

Michael J. Basile, Asst. Atty. Gen., Charleston, for appellee.

Stephen C. Littlepage, Pt. Pleasant, for appellant.

PER CURIAM:

On February 4, 1991, the Circuit Court of Jackson County sentenced the defendant, Dusty Harold Beegle, to life in the penitentiary, with a recommendation of mercy, for first degree murder. In the present appeal, the defendant claims that the trial court erred in failing to grant him a change of venue and in excluding evidence of the deceased's reputation as being a dangerous, violent, and quarrelsome person. He also argues that the trial court improperly refused to allow the jury to consider a voluntary manslaughter verdict and refused to give certain of his instructions. Lastly, he claims that the court erred by permitting the State to introduce evidence on, and thereafter instruct the jury on, the issue of flight. After reviewing the questions presented, this Court disagrees with the defendant's claims and affirms his conviction.

According to witnesses in this case, during the early morning hours of August 12, 1989, the defendant shot and killed one John R. Fletcher on the parking lot of a bar located near Ripley, West Virginia. After the killing, the defendant fled the scene and remained at large until the next day, when he turned himself in.

During the trial of this case, evidence was introduced indicating that the defendant was casually acquainted with John R. Fletcher and that the two individuals had encountered each other at the Hershey Bar outside Ripley some two hours prior to the shooting. While in the bar, the relationship between the two appeared to be cordial. No difficulties occurred until approximately 3:00 a.m., when the appellant chose to leave the bar with his social companion, one Patsy Randolph, who was highly inebriated and who did not want to leave. The victim, John R. Fletcher, apparently did not feel that the defendant should force Ms. Randolph to leave, and followed the defendant and Ms. Randolph out of the tavern. According to the victim's wife, who testified for the State during trial, the victim said: "Dusty, don't force her to do nothing she don't want to do." According to the same witness, the defendant looked at the victim and said, "Buddy, go back inside and stay out of it or I'll shoot your ass." The victim did not at this time have a weapon on him, but he did have a beer bottle, with beer in it, in one hand. The defendant then proceeded to lead Ms. Randolph to his van. The victim followed. The defendant opened the slide door on the van and threw Ms. Randolph in. He then

reached into something like a cooler inside the van and pulled out a gun and shot the victim in the forehead. At the time, the victim was standing by the front fender of the van.

During trial, the defendant did not deny shooting the victim, but explained:

When I got the gun, I was going to try to ward off an attack that I thought was imminently coming. I did not mean for the gun to go off. I did not mean for the projectile to strike John Fletcher in the forehead. I did not mean to kill anybody.

He further testified that, "... I was not angry. I was in fear for my life." When asked whether he was mad, he said, "No, I was scared." He also said that he did not see any weapon on the victim, but, "I didn't know what he had in his hand. I didn't know where he had been from the time I seen him in the bar last to the time I seen him standing right beside me."

According to evidence adduced by the defendant, on at least two occasions prior to the shooting, the defendant and the victim had been involved in situations resulting in ill feelings. On those occasions the defendant had bested the victim in arm wrestling competitions, and the defeats suffered had greatly irritated the victim. Also, according to the defendant's evidence, on at least two occasions the victim had threatened him with violence.

In the present appeal, the defendant alleges that the trial court failed to protect him from pretrial publicity and erred in failing to grant him a change of venue.

After being arrested, the defendant, in the Spring of 1990, entered into a plea negotiations with the Prosecuting Attorney of Jackson County, and the negotiations resulted in a plea bargain agreement in which the defendant agreed to plead guilty to second degree murder. The plea bargain agreement was tendered to the trial court, and even though the State recommended its acceptance, the trial court rejected it. During the summer of 1990, the defendant and the prosecuting attorney petitioned the court for reconsideration of the agreement. The petitions were to no avail,

and the trial court again refused to accept the agreement. The defendant, who believed that the trial judge's rejection of the agreement showed prejudice against him, sought a recusal of the trial judge on the ground of prejudice. In July, 1990, the trial court rejected the recusal motion.

There were a number of news reports in Jackson County about the defendant's attempts to enter into a plea arrangement with the prosecuting attorney and with the trial court's rejection of the plea agreement, so, in addition to moving for recusal of the trial judge, the defendant moved for a change of venue. The trial court conducted a hearing on this motion, and the defendant introduced substantial evidence showing that there had been extensive publicity relating to his plea bargain agreement in the Jackson County area.

Defense counsel also called witnesses in an attempt to show that the defendant could not receive a fair trial in the Jackson County area. One of the defendant's witnesses, Norman Slaughter, when asked whether a great number of people in the area had formulated an opinion on the defendant's case, responded: "I really haven't heard that many comments on it from people on what the answer is there." He was later asked: "I'll hit the nail on the head, Mr. Slaughter, based on what you know, what you've read in the papers and the contact you've had with the community, do you have an opinion, as to, whether or not Dusty Beegle could receive a fair and impartial trial, here, in Jackson County, comprised of people, who are Jackson County residents, who can be fair and impartial about this case?" Mr. Slaughter responded: "Well, I can't answer that yes or no. I think if most people are like me, I couldn't remember what I read a year ago, unless, you refresh my memory." A moment later, he said: "I feel he could have a fair trial here as he could any place."

Another witness, Cecil Harold, had conducted a survey of sentiment in Jackson County and had attempted to obtain statements from his interviewees. Relating to his findings, he said: "A lot of people knew Mr. Beegle. A lot of people knew Mr.

Fletcher. You'd get different reactions from different people, but, they'd tell you that they wouldn't want to be a part of any involvement and they wouldn't want to sign these." He later testified that there was "some" hostile opinions against the defendant, and also that, "I ran into some [people] that never heard of it [the case]."

The trial court, at the conclusion of the hearing, denied the motion for change of venue and set the case for trial.

This Court has rather consistently recognized that whether a change of venue should be ordered rests in the sound discretion of a trial court, and its ruling thereon will not be disturbed unless it clearly appears that the court's discretion has been abused. The rule is set forth in syllabus point 2 of *State v. Wooldridge*, 129 W.Va. 448, 40 S.E.2d 899 (1946), as follows:

> To warrant a change of venue in a criminal case, there must be a showing of good cause therefor, the burden of which rests upon the defendant, the only person who, in any such case, is entitled to a change of venue. The good cause aforesaid must exist at the time the application for a change of venue is made. Whether, on the showing made, a change of venue will be ordered, rests in the sound discretion of the trial court; and its ruling thereon will not be disturbed, unless it clearly appears that the discretion aforesaid has been abused.

*See also, State v. Plumley*, 181 W.Va. 685, 384 S.E.2d 130 (1989); *State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251 (1983); *State v. Hall*, 171 W.Va. 212, 298 S.E.2d 246 (1982); *State v. Sette*, 161 W.Va. 384, 242 S.E.2d 464 (1978); *State v. Riley*, 151 W.Va. 364, 151 S.E.2d 308 (1966); *State v. Pietranton*, 140 W.Va. 444, 84 S.E.2d 774 (1954).

█ In syllabus point 1 of *State v. Pratt*, 161 W.Va. 530, 244 S.E.2d 227 (1978), the Court further stated that:

> "Good cause shown" for change of venue, as the phrase is used in W.Va. Constitution, Article III, Section 14 and *W.Va. Code*, 62–3–13, means proof that a defendant cannot get a fair trial in the county where the offense occurred be-

cause of the existence of locally extensive present hostile sentiment against him.

*See also, State v. Lassiter*, 177 W.Va. 499, 354 S.E.2d 595 (1987). It has also been recognized that widespread publicity of itself does not require a change of venue and that proof that prejudice exists against an accused does not require a change of venue unless it appears that the prejudice against the accused is so great that he cannot get a fair trial. *See State v. Gangwer*, 169 W.Va. 177, 286 S.E.2d 389 (1982), and *State v. McFarland*, 175 W.Va. 205, 332 S.E.2d 217 (1985).

█ In the present case, the record shows that even though there was evidence of widespread publicity relating to the charges against the defendant in the Jackson County area where he was tried, that evidence did not show that the defendant could not receive a fair trial. The defendant's own witness, Norman Slaughter, expressed the opinion that the defendant could receive as fair a trial in Jackson County as anywhere, and Cecil Harold, who conducted a survey of sentiment in Jackson County, indicated that different people had different reactions to the publicity and concluded that some people had never heard of the case. Further, extensive *voir dire* of prospective jurymen was conducted prior to trial. In the course of that *voir dire*, defense counsel inquired of the prospective jurors whether they could put the publicity relating to the defendant's case out of their minds and decide the case based upon the evidence adduced at trial. The panel of prospective jurors indicated that they could so decide the case and that they could put the pretrial publicity out of their minds. The jurors also indicated that they had no preconceived notions about the case based upon what they had read. In the course of the *voir dire*, the defendant did not challenge the qualifications of any juror who was ultimately chosen to sit in the case.

The defendant's next claim is that the trial court improperly refused to permit him to develop the full details of the deceased's propensity for being a violent and quarrelsome man.

Before discussing this point, the Court believes that it is important to note that from the documents filed in this case, it appears that the defendant proposed to offer evidence of *specific instances of misconduct* by the victim in order to show his propensity for violence and quarrelsomeness. In his reply brief filed in the present appeal, the defendant states that he "desired to use evidence from a number of witnesses who could testify that the victim, John Fletcher, was a ruffian, had the propensity to brawl (especially if he was in an intoxicated condition), and had a turbulent past background which included assaults and batteries on several other individuals during the deceased's lifetime." He then complains that early in the proceeding in the case the trial court prohibited him "from introducing character evidence on the deceased's activities for any act that had taken place more than five (5) years before the deceased's death." He states that he and his counsel investigated the victim's background and criminal record, and that he desired to call a witness who had knowledge of the victim's attack on a man named Charles Moss. He also states that he had six or seven witnesses who could have testified that the victim was quarrelsome, had a turbulent background, and had a propensity to engage in violence upon others. Lastly, he complains that the trial court refused to permit him to introduce testimony from two women who could have testified about an occasion when the victim came to their home and put a gun to their heads. It also appears that the defendant did not at the time of the shooting have knowledge of the specific acts against third parties by the victim, but learned of them through his investigator after the shooting.

■ In syllabus point 3 of *State v. Woodson,* 181 W.Va. 325, 382 S.E.2d 519 (1989), this Court held:

Under Rule 405(b) of the West Virginia Rules of Evidence, a defendant in a criminal case who relies on self-defense or

provocation may introduce specific acts of violence or threats made against him by the victim, and if the defendant has knowledge of specific acts of violence against third parties by the victim, the defendant may offer such evidence.

■ In the present case, upon the current state of the record and under the particular facts and authorities cited, this Court cannot conclude that the trial court's exclusion of the testimony which the defendant sought to adduce was prejudicial.[1]

Thus, under the law as summarized in syllabus point 3 of *Woodson,* and without further development of the record, we are unable to conclude that the trial judge erred in excluding the evidence.

The defendant next claims that the trial court erred in failing to provide the jury with all possible verdicts under the indictment against him. Specifically, he asserts that although the State of West Virginia offered jury instructions which allowed the jury to consider the possibility of voluntary manslaughter, the trial court improperly elected to remove all instructions on voluntary manslaughter and thus precluded the jury from considering a lesser included offense in the charge against him. He essentially claims that, without the voluntary manslaughter verdict form, the trial jury was left to decide between the verdicts of murder in the first degree, murder in the second degree, involuntary manslaughter, and not guilty.

This Court has rather consistently defined voluntary manslaughter as a sudden, intentional killing upon gross provocation and in the heat of passion. *See State v. Stalnaker,* 167 W.Va. 225, 279 S.E.2d 416 (1981); *State v. Duvall,* 152 W.Va. 162, 160 S.E.2d 155 (1968); *State v. Bowyer,* 143 W.Va. 302, 101 S.E.2d 243 (1957); *State v. Foley,* 131 W.Va. 326, 47 S.E.2d 40 (1948); *State v. Zannino,* 129 W.Va. 775, 41 S.E.2d 641 (1947); *State v. Barker,* 128 W.Va. 744, 38 S.E.2d 346 (1946).

1. This Court recently discussed character evidence under Rule 405(a) in *State v. Dietz,* 182 W.Va. 544, 390 S.E.2d 15 (1990), and in the second *Dietz* case, *Dietz v. Legursky,* 188 W.Va. 526, 425 S.E.2d 202 (W.Va.1992).

In the present case the evidence adduced showed that the victim and his wife were socializing with the appellant and Patsy Randolph inside a bar before the commission of the crime charged. The victim and Patsy Randolph had danced a few times, and at closing time Ms. Randolph did not want to leave. The defendant then dragged Ms. Randolph out onto the parking lot, and the victim followed. The victim told the defendant not to force Ms. Randolph to do anything that she didn't want to do. The defendant, according to the State's evidence, threatened the victim, stating that he would "shoot his ass." The defendant then dragged Ms. Randolph across the parking lot to his van and opened the van door. He threw Patsy inside the van and reached into the van, pulled out a gun, and shot the victim in the forehead.

When questioned about the shooting during trial, the defendant testified that he had pulled the gun to ward off an attack which he believed was imminently coming. While there is some suggestion that he might have been upset with, or concerned over, Ms. Randolph, he specifically denied that he was angry at the victim. He said, "... I was not angry. I was in fear for my life." A short time later, when asked whether he was mad, he said, "No, I was scared."

It is a rather well established principle in this State that instructions must be based upon the evidence and an instruction which is not supported by the evidence should not be given. *State v. Sexton*, 176 W.Va. 595, 346 S.E.2d 745 (1985); *State v. Collins*, 154 W.Va. 771, 180 S.E.2d 54 (1971).

■ As previously indicated, this Court has also rather consistently indicated that a voluntary manslaughter is by definition a homicide which is committed in the heat of passion. While a fair reading of the evidence in the present case might suggest that the defendant shot John Fletcher out of fear, the defendant's own testimony shows that he was not acting in anger or the heat of passion, and there is some testimony that some time passed between the time the defendant threatened to shoot

the victim and when he actually shot him. Given the testimony, this Court cannot conclude that the giving of a voluntary manslaughter instruction was supported by the evidence or that the trial court erred in failing to give such an instruction.

The defendant next claims that the trial court committed reversible error in failing to give a number of the instructions which he offered.

Three of the instructions which the trial court refused to give, defendant's instructions 19, 20, and 23, were self-defense instructions, instructions defining the defendant's right to "repel force by force." Regarding these issues the trial judge, in his charge to the jury, stated:

One of the questions to be determined by you in this case is whether or not the defendant acted in self-defense so as to justify his acts. Under the laws of this State, if the defendant was not the aggressor, and had reasonable grounds to believe and actually did believe that he was in imminent danger of death or serious bodily harm from which he could save himself only by using deadly force against his assailant, he had the right to employ deadly force in order to defend himself. By deadly force is meant force which is likely to cause death or serious bodily harm.

■ In syllabus point 20 of *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966), this Court stated: "It is not reversible error to refuse to give instructions offered by a party that are adequately covered by other instructions given by the court." *See also, State v. Armstrong*, 179 W.Va. 435, 369 S.E.2d 870 (1988).

In this Court's view, the trial court adequately covered the self-defense issue raised by the defendant, and under the rule in *Hamric*, this Court cannot conclude that the trial court committed reversible error by refusing to give Defendant's Instructions Nos. 19, 20, and 23.

Similarly, Defendant's Instructions Nos. 22 and 27 were clearly covered by the court's charges. Defendant's Instruction No. 22 dealt with the definition of self-

defense. The court's charge, as previously quoted, covered that matter. Defendant's Instruction No. 27 dealt with the fact that all jurors had to find the defendant guilty beyond a reasonable doubt. The trial judge's charge stated:

> [T]he presumption of innocence alone is sufficient to acquit a defendant, unless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

. . . . .

> The jury will remember that a defendant is never to be convicted on mere suspicion or conjecture.

> The burden is always upon the prosecution to prove guilt beyond a reasonable doubt.

Defendant's Instruction No. 26 dealt with the intent necessary for the crimes charged. This was covered by the trial court's instructions on possible verdicts in the case.

The defendant also argues that the trial court erred in not giving his Instruction No. 24. This was covered by the court's charge, and regarding it, defense counsel said, "I'll withdraw 24."

Overall, this Court believes that the defendant's claim that the trial court's failure to give the instructions mentioned was prejudicial is without merit.

Lastly, the defendant claims that the trial court committed reversible error by permitting the State of West Virginia to introduce evidence on the issue of flight and by thereafter instructing the jury on that issue.

■ In *State v. Payne*, 167 W.Va. 252, 280 S.E.2d 72 (1981), this Court recognized that evidence of a defendant's flight is admissible when its probative value outweighs its possible prejudicial effect. The Court also indicated that an *in camera* hearing should be conducted to determine that question. In syllabus point 6 of *State v. Payne*, the Court stated:

> In certain circumstances evidence of the flight of the defendant will be admissible in a criminal trial as evidence of the defendant's guilty conscience or knowledge. Prior to admitting such evidence, however, the trial judge, upon request by either the State or the defendant, should hold an *in camera* hearing to determine whether the probative value of such evidence outweighs its possible prejudicial effect.

*See also, State v. Harper*, 179 W.Va. 24, 365 S.E.2d 69 (1987).

■ In the present case, the State requested an *in camera* hearing regarding the admissibility of flight information which it intended to offer into evidence. The trial court noted on the record that the evidence which the State intended to offer had already been developed at the defendant's bond hearing and that that evidence was before the court.

The evidence as developed showed that immediately after the shooting giving rise to the charges in the present case, the defendant immediately fled to Tupper's Creek to sleep. After waking, he drove to his wife's house in South Charleston.

This Court believes the evidence of immediate flight was potentially probative of a guilty conscience or knowledge and that it does not appear that the trial court erred in allowing its admission into evidence.

For the reasons stated, the defendant's conviction is affirmed.

Affirmed.