662 S.E.2d 515

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Dreu FERGUSON, Jr., Defendant Below, Appellant.**

No. 33530.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 12, 2008.

Decided Feb. 28, 2008.

Teresa C. Monk, Drew Patton, Spencer, for the Appellant.

Darrell V. McGraw, Jr., Attorney General, R. Christopher Smith, Assistant Attorney General, Charleston, for the Appellee.

PER CURIAM:

This is an appeal by Dreu Ferguson, Jr., defendant below (hereinafter "Mr. Ferguson"), from his criminal conviction for voluntary manslaughter related to the shooting death of his neighbor, Mr. William Freas (hereinafter "Mr. Freas"). Mr. Ferguson claims that the Circuit Court of Mason County erred by striking the testimony of Dr. Timothy Saar, which was offered to establish Mr. Ferguson's defense of diminished capacity. The State confesses error and does not oppose Mr. Ferguson's request for a new trial. Having thoroughly reviewed the parties' briefs, the record submitted on appeal, and the relevant law, we agree. Accordingly, we reverse Mr. Ferguson's conviction and remand this case for a new trial.

I.

**FACTUAL AND PROCEDURAL HISTORY**

The events underlying this criminal action occurred on the morning of June 11, 2003, in Spencer, Roane County, West Virginia. While many of the facts of this case are controverted, Mr. Ferguson does not dispute that, on that morning, he observed the victim, his neighbor Mr. Freas, sitting on the porch of the Freas residence. Mr. Ferguson

then retrieved his rifle and walked over to the Freas residence. The two men argued, and Mr. Ferguson shot Mr. Freas in the chest, killing him.

During the trial of this matter, Mr. Ferguson testified and alleged that, prior to June 11th, there had been significant tension between Mr. Ferguson and Mr. Freas. The source of this tension was Mr. Ferguson's belief that Mr. Freas had participated in a recent burglary of Mr. Ferguson's home, and Mr. Ferguson's frustration with Mr. Freas's failure to provide any information regarding the burglary, or to otherwise assist Mr. Ferguson in recovering the items that had been stolen from his home.[1] Mr. Ferguson apparently also believed that Mr. Freas had inappropriately flirted with Mr. Ferguson's wife. Mr. Ferguson testified that after the burglary he and his wife felt "violated" and "preyed upon." He stated that his anxiety was rising because he felt confined to his home, fearing that if he left there would be another break-in. Mr. Ferguson testified that, on the morning of June 11th, he had reached his "breaking point," and upon seeing Mr. Freas, he took the rifle and went to confront Mr. Freas about the burglary. According to Mr. Ferguson, he hoped to intimidate Mr. Freas to deter a future break-in, and also hoped to gain information from Mr. Freas that would help him retrieve his stolen property.

When Mr. Ferguson arrived at the Freas home, he stopped at the bottom of the porch stairs and fired a shot into the air.[2] Jeremiah Starcher, a friend of Mr. Freas who had been visiting with him on the porch, then jumped from the porch and observed the exchange between Messrs. Ferguson and Freas from a distance. Mr. Ferguson testified that he demanded the return of his stolen property. According to Mr. Ferguson, Mr. Freas denied having the items, stood up and walked toward Mr. Ferguson saying

"that doesn't scare me, I've been blasted before. If you're going to blast me, blast me."[3] Mr. Ferguson states that Mr. Freas came at him "throwing his arms at me and that's when the second shot went off." Mr. Freas sustained a single, fatal gunshot wound to the chest. Mr. Ferguson fled the scene in his car.

The police were summoned, and a warrant was subsequently issued for the arrest of Mr. Ferguson. A couple of days later, Mr. Ferguson turned himself in to authorities in the state of Indiana. He waived extradition and was returned to West Virginia where he was charged with first-degree murder. He pled not guilty. Due to difficulties in obtaining an unbiased jury in Roane County, venue was transferred to Mason County. A jury trial commenced on October 27, 2004; however, a mistrial was later declared as a result of juror misconduct. A second jury trial was commenced in Mason County on November 1, 2006. Mr. Ferguson sought to present a diminished capacity defense, contending that he lacked the ability to form the intent to kill Mr. Freas at the time of the shooting. In support of his defense theory, he offered the testimony of Dr. Timothy Saar, a psychologist.

During the trial, Dr. Saar opined that Mr. Ferguson suffered from schizo affective disorder. Dr. Saar stated "[t]hat's the worst of both worlds. It's manic or bipolar and schizophrenia." Dr. Saar further testified, in relevant part, as follows:

Q: Could it affect his judgement at the time of this crime?

A: Yes and I believe this is because when we talked about coping skills when Mr. Ferguson is under stress, based on the testing, both mine and Dr. Smith's, there's a drastic deterioration to see options. Where we have a stressful situation[ ] we

---

1. In this regard, Mr. Ferguson testified that his home was clearly visible from the Freas home. Therefore, Mr. Ferguson, on a couple of occasions, had asked Mr. Freas if he had seen anything going on at the Ferguson home on the day of the burglary. Mr. Freas allegedly gave inconsistent answers with respect to his whereabouts on that day, but consistently denied any knowledge of the goings on at the Ferguson home on the day of the burglary.

2. No one was injured by this shot.

3. To the contrary, the State presented evidence indicating that Mr. Freas was not acting in a threatening manner, but rather was asking Mr. Ferguson not to shoot.

see A, B, C, D, he had a tendency to see C. Hindsight [sic] we think that was a bad choice. At the time it seemed like the best alternative. Do you want me to go into why I thought he felt he might have thought it was the best?

Q: Yes.

A.: There was a number of things going on. Mr. Ferguson was under significant stress at the time this occurred. Apparently [sic] had been a robbery where some of the stuff was stolen out of the home, he believed the victim [sic] taken the stuff and felt that nothing was being done about this. We know his faith in the police system because of some of his delusions was minimal at best. He didn't see the police as an option for help. He also was having some marital difficulty along these times and so he's sitting there that day of the shooting and sees the individual across the way, he's under a significant amount of stress, he's unable to get his property, he feels he doesn't have the option to call the police to come get the stuff or to help him.

He knows he also can't get in trouble, he can't go out and confront the individual, cause a fist fight or something along those lines because he runs the risk of not seeing his children again or causing him difficulties so his thinking at the time my belief is I'll present myself with significant force or to avoid conflict and that's not as unusual as it sounds. Certainly law enforcement officers when you go to apprehend a criminal tend to go in mass or discourage the individual for [sic] acting out in a violent way so at that time Mr. Ferguson grabbed a gun with the idea of getting the suff back and confronting the individual and also trying to avoid physical altercation and we know that that didn't work out because events changed through the course of time.

He fired a shot over the individual and the individual continued to come at him and he may have viewed that as a threat and obviously unfortunately for the individual at that time he then put the gun down .... *I don't believe based on this information that I have ... that he had the intent to kill this individual.*

I think that he wanted his stuff back and felt the need to protect his family and confront this individual. Given the fact the stress level continued to increase and [sic] continued to engage in more bizarre thinking he felt this was the best option. We know that obviously was not the case, but his thinking at this time was this is a way to avoid conflict and deal with this situation.

Q. *Would this affect an intent, a specific intent like intent to kill?*

A. *Yeah, I don't think he had any intent to kill.* It goes back to what I talked about, his idea was to go out there he hasn't seen the police as an option or physical altercation, he felt like going out there in force to almost kind of scare the person into admitting where the stuff was or getting the stuff back so yes, *I think his thinking was impaired at the time and that would drastically affect his intent. I don't think he had the intent to kill I think he had intent to go find out what happened to his stuff.*

Q. Does a person with this disorder do reckless things?

A. They can when influenced by the stuff we talked about, that is delusions of grandeur, which is thinking you have more skills than you do, paranoid delusions, you may think someone else is out to get you or if they suffered from mania you tend to have excessive amount of energy, rapid thought. *Combining the schizo affective with the intense anxiety that the psychological testing showed, yes, it would impair his judgement at the time with regards to intent.*

(Emphasis added).

No objections were made during or immediately following Dr. Saar's testimony. After offering the testimony of a few more witnesses, the defense rested. The following day, during preparation of the jury charge, the State objected to an instruction on diminished capacity and asked that the testimony of Dr. Saar be stricken based upon its failure to establish the level of diminished capacity required under West Virginia law "in that he did not state that the defendant suffered from a mental illness and that mental illness

presented [sic] the defendant from having the capacity to form intent." The circuit court granted the State's motion to strike Dr. Saar's testimony. Defense counsel objected and moved to strike the State's medical experts as their testimony had been offered in rebuttal to Dr. Saar's testimony. Defense counsel also objected to the timeliness of the State's motion to strike, and requested that the case be reopened to receive additional clarifying testimony from Dr. Saar. The circuit court ultimately struck all the psychological testimony, that offered by the defense as well as that of the State's expert rebuttal witnesses. In addition, the circuit court effectively denied the motion to reopen the case. The circuit court then instructed the jury, in relevant part, as follows:

> You have heard the testimony of a witness, Janis Blake, who worked at an office with Dr. Timothy Saar, a psychologist. You have heard the testimony of Timothy Saar and certain opinions that he expressed. You have heard the testimony of Dr. Ralph Smith and certain opinions that he has expressed and you heard the testimony of, limited as it was, of Mr. Ferguson's mother, Janet Springstedah, relating to an issue as to whether Dr. Smith had ever seen Mr. Ferguson.

> The Court has made a determination that the testimony of Dr. Saar does not rise to the level recognized under our law for him to express opinions relating to his evaluation of Mr. Ferguson. Ms. Blake works at his office and conducted some tests to aid him in his evaluation. Dr. Ralph Smith was called by the State in rebuttal in response to Dr. Saar's testimony and Janet Springstedah was called in what we call surrebuttal in response to an examination of Dr. Ralph Smith.

> For the reasons that the opinion expressed by Mr. [sic] Saar does not rise to the level recognized by the West Virginia Supreme Court of Appeals to be permitted to go to the jury for jury consideration, you shall disregard and put out of your mind testimony of Janis Blake, Dr. Timothy Saar, Dr. Ralph Smith and Janet Springstedah. No psychological issues are not [sic] an issue in this case.

Defense counsel then moved for a mistrial. The motion was denied, and the case was submitted to the jury. The verdict was returned finding Mr. Ferguson guilty of voluntary manslaughter. Thereafter, by order entered on December 7, 2006, the circuit court denied Mr. Ferguson's motion for a new trial and sentenced him to a definite term of fifteen years. Mr. Ferguson petitioned this Court for an appeal of his conviction. We granted the petition.

## II.

### STANDARD OF REVIEW

■ Procedurally, this case is before this Court upon the circuit court's denial of Mr. Ferguson's motion for a new trial. Thus, our review is for an abuse of discretion:

> According to Rule 33 of the West Virginia Rules of Criminal Procedure [(1995)], "[t]he court on motion of a defendant may grant a new trial to [that defendant] if required in the interest of justice." "The question of whether a new trial should be granted is within the discretion of the trial court and is reviewable only in the case of abuse." *State v. Crouch,* 191 W.Va. 272, 275, 445 S.E.2d 213, 216 (1994) (citation omitted).

*State v. Helmick,* 201 W.Va. 163, 167, 495 S.E.2d 262, 266 (1997) (footnote omitted). However, in determining the propriety of the circuit court's ruling on Mr. Ferguson's motion for a new trial, we are further asked to review the lower court's ruling with respect to the admissibility of expert testimony. Our standard for considering this issue is clear error:

> " 'The admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong.' Syllabus Point 6, *Helmick v. Potomac Edison Co.,* 185 W.Va. 269, 406 S.E.2d 700 (1991), *cert. denied,* 502 U.S. 908, 112 S.Ct. 301, 116 L.Ed.2d 244 (1991)." Syllabus point 1, *West Virginia Division of Highways v. Butler,* 205 W.Va. 146, 516 S.E.2d 769 (1999).

Syl. pt. 1, *Watson v. Inco Alloys Int'l, Inc.,* 209 W.Va. 234, 545 S.E.2d 294 (2001). With

these guidelines in mind, we proceed to address the issues raised in this appeal.

## III.

### DISCUSSION

■ Mr. Ferguson has raised three assignments of error; however, the question of whether the circuit court erred in striking the testimony of Dr. Saar is dispositive of this appeal. Thus, we will limit our discussion to address only that error.[4]

Dr. Saar's testimony was offered in support of Mr. Ferguson's diminished capacity defense. The circuit court struck the testimony of Dr. Saar based upon its finding that Dr. Saar's testimony failed to meet the standard for that defense set forth by this Court in *State v. Joseph,* 214 W.Va. 525, 590 S.E.2d 718 (2003). Mr. Ferguson contends that, even though Dr. Saar did not utter the buzz words "capacity to form intent," the content of his testimony plainly expressed the doctor's opinion that Mr. Ferguson lacked the capacity to form the intent to kill, and therefore plainly met the *State v. Joseph* standard. Mr. Ferguson further notes that, pursuant to *State v. Joseph,* an expert witness is permitted to offer an opinion regarding a defendant's intent in connection with the defense of diminished capacity.

■ The State observes that all of the assignments of error raised in this appeal stem from the circuit court's exclusion of the testimony of Dr. Saar. The State agrees that Dr. Saar did testify that Mr. Ferguson manifested a diminished capacity to form an intent to kill the victim due to various psychological conditions from which he suffered. The State observes that Dr. Saar's testimony is similar to that of the expert testimony that was approved by this Court in *State v. Joseph.* Thus, the State concedes that the testimony should not have been stricken. Therefore, the State does not oppose granting Mr. Ferguson a new trial.

■ While "[w]e commend the State's candor on this issue[,] . . . confessions of error do not automatically entitle a party to a reversal[;] reversal is required when it can be ascertained that the errors confessed are supported by law." *State v. Berrill,* 196 W.Va. 578, 587, 474 S.E.2d 508, 517 (1996) (internal quotations and citations omitted). In other words, "[t]his Court is not obligated to accept the State's confession of error in a criminal case. We will do so when, after a proper analysis, we believe error occurred." Syl. pt. 8, *State v. Julius,* 185 W.Va. 422, 408 S.E.2d 1 (1991). *See also* Syl., *State v. Goff,* 159 W.Va. 348, 221 S.E.2d 891 (1976) ("In a criminal case where the state confesses error, urges that the judgment be reversed and that the defendant be granted a new trial, this Court, upon ascertaining that the errors confessed are reversible and do in fact constitute cause for the reversal of the judgment of conviction, will reverse the judgment and grant the defendant a new trial."). Thus, notwithstanding the State's confession of error, we must nevertheless give our own consideration to Dr. Saar's testimony in light of our prior holding in *State v. Joseph.* We begin with a review of *Joseph.*

■ The defendant in *Joseph* was "charged with first-degree murder . . . [and] sought to assert the defense of diminished capacity resulting from [a] brain injury sustained in his motorcycle accident of 1989." 214 W.Va. 525, 528, 590 S.E.2d 718, 721. In support of this defense, the defendant sought to offer the expert witness testimony of Dr. Solomon. 214 W.Va. at 532, 590 S.E.2d at 725. The circuit court in *Joseph* conducted an *in camera* hearing and thereafter excluded the testimony of Dr. Solomon as failing "to establish that Mr. Joseph suffered from a diminished capacity." *Id.* On appeal, this Court observed that "[a] review of West Virginia case law reveals that this Court has all but expressly recognized the use of evidence of a diminished capacity resulting from a mental disease or defect to negate the mental state of the crime charged." *Id.* at 531, 590

---

4. The two additional errors raised by Mr. Ferguson are: (1) the circuit court erred in not allowing Mr. Ferguson to re-open his case and recall Dr. Saar to correct the technical language defect and further clarify his testimony; and (2) the circuit court erred and prejudiced the jury by instructing the jury that Dr. Saar's testimony was to be stricken from the record because it did not "arise to the standard set by the West Virginia Supreme Court of Appeals."

S.E.2d at 724. Based upon this history, and a review of other authorities, the Court held that

> [t]he diminished capacity defense is available in West Virginia to permit a defendant to introduce expert testimony regarding a mental disease or defect that rendered the defendant incapable, at the time the crime was committed, of forming a mental state that is an element of the crime charged. This defense is asserted ordinarily when the offense charged is a crime for which there is a lesser included offense. This is so because the successful use of this defense renders the defendant not guilty of the particular crime charged, but does not preclude a conviction for a lesser included offense.

Syl. pt. 3, *id.*

Applying the newly-announced syllabus point to the testimony of Dr. Solomon, this Court noted, in the context of first-degree murder, that " '[a] defendant who raises a diminished capacity defense ... challenges his capacity to premeditate and deliberate *at the time of the criminal act.*' " *Joseph* at 533, 590 S.E.2d at 726 (quoting *Commonwealth v. Brown*, 396 Pa.Super. 171, 181–82, 578 A.2d 461, 466 (1990)). The Court then determined that Dr. Solomon's testimony was sufficient to support the defendant's claim of diminished capacity in that

> Dr. Solomon's testimony was addressed directly to Mr. Joseph's mental capacity at the time of his criminal offense and Dr. Solomon opined that Mr. Joseph was, due to his mental defect, unable "to formulate intent or malice or to premeditate under these circumstances." Thus, in the instant case, there plainly was sufficient evidence to allow Dr. Solomon to testify before the jury. Accordingly, the circuit court was clearly wrong in excluding this evidence and prohibiting Mr. Joseph from presenting his defense attacking the State's case in chief.

214 W.Va. at 534, 590 S.E.2d at 727 (footnote omitted).[5] Comparing Dr. Solomon's testimony in *Joseph* to that of Dr. Saar in the instant case, we believe that Dr. Saar's testimony, taken as a whole, was adequate to support Mr. Ferguson's challenge to his capacity to form the intent to kill.[6] In his

---

5. With respect to Dr. Solomon's testimony, the Court in *State v. Joseph,* observed that

> Dr. Solomon made the following relevant comments during his *in camera* testimony:
> "All the indications ... pointed to me that he had suffered frontal lobe damage, that his long-term knowledge was intact but he underwent tremendous personality change along with the other things I talked about."
> ....
> "He knows where he is, who he is, what time of day it is, what month it is. All of those things are within normal limits. It's the executive functions that I found to be diminished to show a great loss."
> ....
> "Under the circumstances that existed there that morning, I think his ability to plan, organize, carry out decision-making processes were extremely flawed due to his brain injury. In other circumstances the situation might be different."
> ....
> "Given those circumstances, I think his ability to plan and carry out a premeditated plan of action would have been diminished."
> ....
> "I can say yes, I think within a scientific certainty that his capacity was diminished during that particular time frame."
> "Q. And that was the capacity to premeditate, to intend, and to have malice; is that correct?"

> "A. Yes. Given those circumstances, that's correct."
> Dr. Solomon also acknowledged that in his report he expressed his opinion that "within a reasonable scientific probability ... Mr. Robert Joseph was operating under an involuntary state of diminished capacity and that this tragic shooting happened without malice due to his diminished capacity." Finally, the circuit court asked Dr. Solomon to clarify his position, and stated "[y]ou're saying ... that he's suffering from some mental defect which precludes him from being able to formulate intent or malice or to premeditate under these circumstances. Is that correct?" To which Dr. Solomon answered, "I think that's a pretty correct phrases (phonetic) of what I'm trying to say."

*State v. Joseph,* 214 W.Va. 525, 532–33, 590 S.E.2d 718, 725–26 (2003).

6. Because Mr. Ferguson has been convicted of voluntary manslaughter, the mental state he must challenge is the intent to kill *See State v. Wright,* 162 W.Va. 332, 334, 249 S.E.2d 519, 521 (1978) ("It is fundamental in this jurisdiction that voluntary manslaughter requires [an] intent to kill. *State v. Hamrick,* [160] W. Va. [673], 160 W.Va. 673, 236 S.E.2d 247 (1977); *State v. Blizzard,* 152 W.Va. 810, 166 S.E.2d 560 (196[9] ); *State v. Duvall,* 152 W.Va. 162, 160 S.E.2d 155 (1968); *State v. Reppert,* 132 W.Va. 675, 52

testimony, Dr. Saar plainly expressed his belief that Mr. Ferguson suffered from a mental condition that impaired his ability to form the intent to kill at the time he shot Mr. Freas. For example, when asked "[w]ould this [meaning his schizo affective disorder] affect an intent, a specific intent like intent to kill," Dr. Saar responded,

A. *Yea, I don't think he had any intent to kill.* It goes back to what I talked about, his idea was to go out there he hasn't seen the police as an option or physical altercation, he felt like going out there in force to almost kind of scare the person into admitting where the stuff was or getting the stuff back so yes, *I think his thinking was impaired at the time and that would drastically affect his intent. I don't think he had the intent to kill. I think he had intent to go find out what happened to his stuff.*

(Emphasis added). Dr. Saar also stated "I don't believe based on this information that I have . . . that he had the intent to kill this individual." Finally, Dr. Saar stated that "[c]ombining the schizo affective with the intense anxiety that the psychological testing showed, yes, it would impair his judgement at the time with regards to intent." As with Dr. Solomon's testimony in *Joseph,* Dr. Saar's testimony was "adressed directly" to Mr. Ferguson's "mental capacity at the time of his criminal offense." *Joseph,* 214 W.Va. at 534, 590 S.E.2d at 727. Dr. Saar plainly opined that, due to Mr. Ferguson's schizo affective disorder in combination with "the intense anxiety that the psychological testing showed," "his thinking was impaired at the time and that would drastically affect his intent. I don't think he had the intent to kill. I think he had [the] intent to go find out what happened to his stuff." Accordingly, we find that the circuit court was clearly wrong in striking the testimony of Dr. Saar, and as a consequence, the circuit court abused it's discretion in failing to grant Mr. Ferguson a new trial.

S.E.2d 820 (1949); *State v. Foley,* 131 W.Va. 326, 47 S.E.2d 40 (1948); and *State v. Barker,* 128

## IV.

## CONCLUSION

Based upon the foregoing discussion, we reverse the December 7, 2006, order of the Circuit Court of Mason County and remand this case for a new trial consistent with this opinion.

Reversed and remanded.

W.Va. 744, 38 S.E.2d 346 (1946).'").