490 S.E.2d 912

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Lorie Ann McGUIRE, Defendant Below, Appellant.**

**No. 23671.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 15, 1997.

Decided July 18, 1997.

---

Scott F. Reynolds, Prosecuting Attorney, Diana L. Crutchfield, Assistant Prosecuting Attorney, Moundsville, for Appellee.

Wray V. Voegelin, Donald J. Tennant, Jr., Cassidy, Myers, Cogan, Voegelin & Tennant, Wheeling, for Appellant.

WORKMAN, Chief Justice:

The defendant below and Appellant herein, Lorie Ann McGuire (hereinafter Appellant), appeals the January 3, 1996, order of the Circuit Court of Marshall County which vacated its prior sentencing order[1] and sentenced Appellant to ten years imprisonment for Appellant's conviction by jury of voluntary manslaughter of her newborn daughter.[2] On appeal, Appellant argues the trial court committed a number of instructional errors. Appellant also asserts that she was denied the right to be present at a critical stage of the proceedings, was prohibited from offering certain psychiatric testimony, and was wrongfully denied credit for the time she served on home confinement while released on pretrial bail. After review of the errors alleged by Appellant, we affirm her conviction and the final order of the trial court.

## I.

### FACTS

At the time of the tragic events of this case, Appellant was a twenty-one-year old college student attending West Virginia Northern Community College. Both Appellant and her fourteen-month-old daughter lived with Appellant's parents in Marshall County. On Wednesday, February 8, 1995, at approximately 3:00 or 3:30 a.m., Appellant gave birth to a baby girl in Appellant's bedroom located on the first floor of her parent's house. Up until this time, Appellant never told her parents that she was pregnant, and, although Appellant's mother was asleep in a bedroom on the second floor, Appellant never alerted her mother to the fact she was giving birth.

At trial, Appellant testified she believed the baby was stillborn. Allegedly acting upon this belief, Appellant wrapped the baby in a towel, took the baby to the basement, and placed the baby in an operating woodstove to dispose of the baby's body. Appellant then went back upstairs and took a bath. After bathing, Appellant apparently decided it would be better to bury the baby's body. Therefore, she went back to the basement, retrieved the baby's severely burnt body from the woodstove, and wrapped the body in a plastic garbage bag. Appellant then placed the baby in the trunk of her car because the ground was frozen and she could not dig a hole until the ground thawed. The next morning, Appellant went to her college classes as if nothing happened.[3] Appellant consistently has maintained the baby was dead at birth and described the baby as not moving and being blue in appearance.

According to the testimony of Appellant's "best friend," Jodi Mangino, Appellant stopped by her house later that day, and told Ms. Mangino that she had something to show her. Ms. Mangino testified that Appellant appeared happy and lifted up the front of her

---

1. The prior sentencing order stated Appellant is to be imprisoned "not less than three (3) nor more than fifteen (15) years...." The trial court reversed this sentence based upon the sentencing requirements for voluntary manslaughter contained within West Virginia Code 61–2–4 (Supp. 1995). This section provides:

    Voluntary manslaughter shall be punished by a definite term of imprisonment in the penitentiary which is not less than three nor more than fifteen years. A person imprisoned pursuant to the provisions of this section is not eligible for parole prior to having served a minimum of three years of his or her sentence or the minimum period required by the provisions of section thirteen [§ 62–12–13], article twelve, chapter sixty-two, whichever is greater.

2. Pursuant to the order, Appellant is required to "serve a minimum of one-fourth (¼) of said sentence prior to her becoming eligible for parole or three (3) years whichever is greater." The January 3, 1996, order also denied Appellant's petition for probation and her request to be released upon bail pending her appeal. On March 7, 1996, this Court entered an order granting Appellant post-conviction bail by posting a $150,-000 bond as surety and conditioned upon home confinement in accordance with the terms and conditions ordinarily imposed in Marshall County. *See* W. Va.Code § 62–1C–1(b) (1992) (providing criteria for post-conviction bail).

3. At some point that day, Appellant washed the sheets on her bed and tried to scrub the blood stain off her mattress. She also turned her mattress over on her bed to hide the blood stain.

shirt to reveal she was no longer pregnant.[4] According to Ms. Mangino, Appellant explained she gave birth about 3:30 a.m. and, afterwards, turned over her mattress, sat in the tub for an hour, and was able to attend school that day. Appellant also told Ms. Mangino she continued to have contractions while at school, causing her to grip her desk so hard that "her hands were turning white...." Ms. Mangino did not ask Appellant about the baby, apparently because Appellant told her that she did not want to know anything else.

The next evening, Ms. Mangino and Appellant spoke over the phone, and Ms. Mangino encouraged Appellant to go see a doctor. Again, there was no discussion about the status of the baby, but Ms. Mangino testified Appellant showed no signs of crying, sadness, sorrow, or regret during either of their conversations. Thereafter, Ms. Mangino placed an anonymous phone call to the sheriff's department and explained to an officer that a friend of hers had given birth and she believed "something bad might have happened." Ms. Mangino refused to give the officer either her name or Appellant's name so the officer requested her to call back the next day and speak with a detective.[5]

After classes the next day, Ms. Mangino called the police and spoke with Dan Livingston, an investigator with the Marshall County Sheriff's Department. During the conversation, Ms. Mangino told Officer Livingston both her name and Appellant's name, and she, along with two other women who knew Appellant, met with Officer Livingston later in the evening. According to Ms. Mangino, Officer Livingston said he needed to speak with some other people because the allegations were based only on her report. Therefore, Ms. Mangino decided to call Appellant the next day and tape record their conversation.

Ms. Mangino testified that during this conversation, Appellant stated she did not go to the doctor, but she told her mother that she was two months pregnant and suffered a miscarriage. Ms. Mangino asked Appellant if the baby was dead and Appellant responded yes. Ms. Mangino then asked Appellant what she did with the baby, and Appellant said she put the baby in the trunk of her car and was going to wait until the ground thawed to bury the baby. Appellant also told Ms. Mangino that she thought about throwing the baby over a hill in a trash bag, but she feared the dogs might bring it back, and she considered putting the baby in a dumpster, but she decided against it as well. During the conversation, Appellant never mentioned that she already had burned the baby's body in the woodstove. Ms. Mangino took the tape recording of the conversation to Officer Livingston.

Thereafter, Officer Livingston and two other police officers went to the McGuire residence to conduct an investigation. When they arrived, Appellant was not there, but Officer Livingston explained the circumstances to her mother. Appellant's mother gave him permission to search the house.

Apparently before the search could begin, Appellant arrived home. Officer Livingston read Appellant her rights while another officer went with Appellant's mother to conduct the search. At first, Appellant denied the pregnancy, but when her mother returned crying after discovering Appellant's bloodstained mattress, Appellant said she had a miscarriage. The officers eventually discovered the baby's frozen and burnt body in the trunk of Appellant's car, wrapped in the towel and the garbage bag.

4. Although Appellant concealed her pregnancy from her parents, Ms. Mangino was aware of Appellant's condition and had discussions with Appellant regarding the possibility of adoption or an abortion. They also discussed prenatal care, and Appellant reportedly told Ms. Mangino she was trying to induce a miscarriage by taking her father's prescription pain pills, consuming large amounts of aspirin, and bouncing her daughter up and down on her stomach. According to Ms. Mangino, Appellant also said she was contemplating dropping a television set or a tractor tire on her stomach and wanted to pay someone to punch her in the stomach. Ms. Mangino testified she advised Appellant not to do these things because she may die. In addition, Appellant drank alcohol and started taking her birth control pills after she missed her period.

5. It was approximately midnight when Ms. Mangino called the police.

The baby's body was taken to Wheeling Medical Center for an autopsy.[6] After authorities learned from the autopsy that the baby was born alive, Appellant was arrested and charged with murder. In defense of the murder charge, Appellant argued at trial she was not guilty by reason of insanity, she was not guilty of any offense greater than involuntary manslaughter because she believed the baby was dead when she placed her in the woodstove, or she was not guilty because the baby was, in fact, dead at birth. After hearing the evidence, the jury convicted Appellant of voluntary manslaughter.

## II.

## JURY INSTRUCTIONS

### A.

### *Standard of Review*

Appellant asserts the trial court erred by denying five jury instructions submitted by defense counsel.[7] When called upon to review a trial court's rejection or acceptance of a specific jury instruction, this Court generally applies an abuse of discretion standard. *State v. Guthrie*, 194 W.Va. 657, 671 n. 12, 461 S.E.2d 163, 177 n. 12 (1995); *State v. Derr*, 192 W.Va. 165, 179, 451 S.E.2d 731, 745 (1994). Likewise, we provide broad discretion to a trial court's formulation of the wording of jury instructions. Syl. Pt. 6, in part, *Tennant v. Marion Health Care Found., Inc.*, 194 W.Va. 97, 459 S.E.2d 374 (1995); *Derr*, 192 W.Va. at 179, 451 S.E.2d at 745. Our review of the legal correctness of a jury instruction, however, is performed de novo,[8] and, when a jury instruction is rejected because of insufficient evidence, our review is plenary. *State v. LaRock*, 196 W.Va. 294, 308, 470 S.E.2d 613, 627 (1996).

As we summarized in syllabus point fifteen of *State v. Bradshaw*, 193 W.Va. 519, 457 S.E.2d 456 (1995):

Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not misled by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. The trial court, therefore, has broad discretion in formulating its charge to the jury, so long as it accurately reflects the law. Deference is given to the circuit court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed for an abuse of discretion.

*Id.* Moreover, a trial court does not commit reversible error by refusing to give an instruction adequately covered by another instruction given to the jury. Syl. Pt. 20, *State v. Hamric*, 151 W.Va. 1, 151 S.E.2d 252 (1966).[9] However, "[i]t is error to give instructions to the jury, even though they state correct propositions of law, when there is no evidence to support some of the hypotheses which they contain." Syl. Pt. 7, *State v. Morris*, 142 W.Va. 303, 95 S.E.2d 401 (1956).[10] Based upon these principles, we begin our analysis of the instructional errors alleged by Appellant.

### B.

### *The Issue of Live Birth*

Appellant first argues the trial court erred by rejecting her proposed instruction

---

6. Upon the recommendation of Officer Livingston, Appellant's mother took Appellant to the hospital for a medical examination.

7. The record reflects Appellant objected to the trial court's rejection of each of these proffered jury instructions.

8. *Parham v. Horace Mann Ins. Co.*, 200 W.Va. 609, 619, 490 S.E.2d 696, 706 (1997) (citations omitted).

9. Syllabus point twenty of *Hamric* provides: "It is not reversible error to refuse to give instructions offered by a party that are adequately covered by other instructions given by the court." *See also* Syl. Pt. 4, *State v. Armstrong*, 179 W.Va. 435, 369 S.E.2d 870 (1988) (quoting syllabus point twenty of *Hamric*).

10. *See also* Syl. Pt. 2, *State v. Hobbs*, 178 W.Va. 128, 358 S.E.2d 212 (1987) (quoting syllabus point seven of *Morris*).

number eleven.[11] Initially, this instruction generally informs the jury that the State must establish beyond a reasonable doubt (1) there was a death of a human being and (2) the death occurred as a result of "a criminal act rather than by natural causes or by accident." The next part of the instruction advises the jury that, in order to establish the death of a human being, the State must prove a live birth.[12] The remainder of the instruction contains Appellant's proposed definition of what factors are necessary for the State to prove the baby was born alive. Appellee objected to the instruction on grounds there was no evidence presented that the baby died of natural causes or by accident. After reviewing the instruction, the trial court sustained the objection and refused to give the instruction.[13]

On appeal, Appellant asserts the issue of whether the baby was born alive was a contested issue at trial and the failure of the trial court to give any instruction in this respect constitutes reversible error. In support of her position, Appellant highlights the testimony given by Howard Gordon, M.D., a board certified physician in obstetrics, gynecology, and maternal and fetal medicine, who testified as an expert on Appellant's behalf. When asked by Appellant's counsel to describe the characteristics of a stillborn baby, Dr. Gordon stated "a recent stillborn or a very depressed baby would be blotchy, pale and blue, a lighter color blue than a healthy newborn, and it would be what we call 'flaccid' which means limp like a rag doll ... but the most noticeable thing would be the lack of movement and the pale blue blotchiness to

**11.** In full, Appellant's proposed instruction number eleven provides:

The jury is further instructed that to establish Corpus Delicti in a homicide case, the State must present evidence which proves to you beyond any reasonabl[e] doubt that there was a death of a human being and that such death was caused by a criminal act rather than by natural causes or by accident.

In a prosecution for the homicide of a newly-born infant, it is incumbent upon the State to prove that the infant was born alive, that the infant had an independent and separate existence apart from its mother, and that the accused was the criminal agent causing the infant's death. Accordingly, in this case, before you may find Lorie McGuire guilty of any offense submitted for your consideration in this case you must first determine whether the evidence presented by the State has established beyond any reasonable doubt that the infant which is alleged to have been killed, was, in fact, born alive and had an independent and separate existence apart from Lorie McGuire.

In making your determination in this case as to whether you believe beyond a reasonable doubt that the infant had been born alive, you are instructed that in the case of an alleged homicide of a newborn, the State must establish beyond any reasonable doubt that the newborn had a separate and independent existence from its mother. In making this determination, you may consider whether the State has established beyond any reasonable doubt that the alleged victim in this had an independent circulation and respiration system prior to its death.

You are further instructed that mere proof that the child had breathed is insufficient to establish a complete and separate existence of

a newborn after birth. You are further instructed that in an infanticide prosecution, the State is bound to establish beyond any reasonable doubt that the child had been born alive in the legal sense, that is, that it had been wholly expelled from its mother['s] body and possessed or was capable of an existence by means of a circulation independent of the mother's. If the jury believes from the evidence in this case that any reasonable doubt exists as to whether the infant was "born alive", as that term has been defined under this Court's instructions, the jury must acquit the defendant. If, however, the jury believes that the evidence has established, beyond any reasonable doubt, that the said infant, was "born alive" as the Court has defined that term, and later died, then the jury is to determine whether the State has established beyond any reasonable doubt that the defendant, Lorie McGuire committed the offense charged under the Indictment in this case or any lesser-included offense under the instructions of this Court

*Id.* (Citations omitted).

**12.** In syllabus point two of *State ex rel. Atkinson v. Wilson*, 175 W.Va. 352, 332 S.E.2d 807 (1984), we held: "Neither our murder statute, W. Va. Code, 61–2–1, nor its attendant common law principles authorize prosecution of an individual for the killing of a viable unborn child." *Id.*

**13.** In rejecting the instruction, the trial court stated it was uncomfortable with some of the language contained in the instruction, particularly with the statement "that mere proof that the child had breathed is insufficient to establish a complete and separate existence of a newborn after birth."

the color of the baby."[14] Dr. Gordon also testified that women who do not receive prenatal care are more likely to have stillborn babies.

Appellant contends Dr. Gordon's description of a stillborn or very depressed baby comports with her own testimony that she believed the baby was dead at birth. Appellant described the baby as limp, not moving, and blue in appearance after delivery. However, on cross-examination, Dr. Gordon admitted he did not examine the baby, he did not review any of the autopsy reports performed on the baby, and he did not review any of Appellant's medical records. In fact, Dr. Gordon stated he did not review any documents with respect to this particular baby's death, and he had no opinion as to the cause of death.

On the other hand, the uncontroverted medical evidence from two separate autopsy reports shows the baby was definitely alive at birth. The first autopsy, performed by Jess S. Renedo, M.D., a forensic pathologist and the Medical Examiner for the Northern Panhandle of West Virginia, revealed either a full-term or close to full-term baby girl who suffered fourth degree burning over almost her entire body. In the report, Dr. Renedo also stated an "[e]xamination of the lungs show, *without any question*, that the baby was alive at birth." (Emphasis added). At trial, Dr. Renedo testified the baby also had a skull fracture measuring two and one-half inches in diameter, but he could not determine whether the skull fracture occurred before or after death due to the extreme burning of the area.

As Dr. Renedo was unable to conclude whether the baby died from the skull fracture or from burning, the baby's body was exhumed less than one and one-half months

later for an additional autopsy. The second autopsy was performed by James L. Frost, M.D., a forensic pathologist and a Deputy Chief Medical Examiner for the State of West Virginia. In addition to examining the baby's lung tissue and the skull fracture, Dr. Frost also performed toxicology studies on the baby's liver. The toxicology studies showed the baby's liver had a sixty percent carbon monoxide saturation level, which, according to Dr. Frost's estimates, meant the baby remained alive while inside the woodstove for five to fifteen minutes.[15] Dr. Frost also testified there were no indications from his autopsy the baby suffered from *in utero* distress. As a result of his findings, Dr. Frost opined the baby died of "thermal burning and acute carbon monoxide intoxication."[16]

■ In light of this evidence, we find the trial court did not err by refusing to give Appellant's proposed instruction number eleven. The conclusive evidence presented at trial demonstrated the baby was alive when she was placed in the woodstove and was able to survive therein for five to fifteen minutes before her new life was hellishly overcome by the smoke and flames. The testimony presented by Dr. Gordon did not refute the cause of death in any way, and Dr. Gordon admitted he reviewed no medical files, conducted no medical tests, and had no opinion as to this baby's cause of death. "As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 887, 99 L.Ed.2d 54, 61 (1988) (citations omitted). However, a trial court is not required to instruct the jury on

---

14. Dr. Gordon explained that a severely depressed baby resembles a recent stillborn because the baby is in shock from a lack of oxygen. He further stated someone without proper equipment and without some professional training of listening or feeling for a heartbeat would not be able to distinguish a stillborn from a severely depressed baby.

15. In his testimony, Dr. Frost further stated that this level of carbon monoxide would be virtually impossible to reach by having a mother who smoked during her pregnancy or by living in a

house heated by a properly vented woodstove. For a baby to have this level of carbon monoxide *in utero*, Dr. Frost said there would need to be near lethal levels of carbon monoxide in the mother's system as well.

16. After seeing the results of the liver testing, Dr. Renedo also opined "[t]here's no question the baby was alive at the time of burning because of the degree of carbon monoxide present in the liver."

an abstract or general defense theory that is not supported by evidence. *LaRock*, 196 W.Va. at 308, 470 S.E.2d at 627 (citations omitted). As the medical evidence definitively established the baby was alive after delivery, we conclude a reasonable juror could not find the baby was born dead. At best, the evidence presented by Appellant relates to whether Appellant knew the baby was alive when she placed her in the woodstove, not to whether the baby actually was alive. Thus, we find the trial court did not abuse its discretion when it rejected Appellant's proposed instruction on what shall constitute a live birth as there was insufficient evidence for the jury to consider the issue.[17]

## C.

### *Involuntary Manslaughter*

Appellant next argues the trial court erred by refusing to give her proposed instruction numbers twenty-three and twenty-five, regarding involuntary manslaughter.[18] Appellee asserts the substance of the instructions was covered in Appellee's instruction number one-A read to the jury and, therefore, the trial court did not abuse its discretion in rejecting the two instructions proposed by Appellant. On the other hand, Appellant argues Appellee's instruction number one-A is confusing and incorrectly states the law of involuntary manslaughter. Upon review, we find the trial court did not abuse its discretion either by accepting Appellee's instruction number one-A or by rejecting Appellant's instruction numbers twenty-three and twenty-five.

■ We begin our analysis by determining whether instruction number one-A properly informs the jury of the elements of involuntary manslaughter. The underlying purpose of this lengthy instruction,[19] inter alia, was to advise the jury as to the elements of first and second degree murder and voluntary and involuntary manslaughter.

---

17. As we find insufficient evidence to support the instruction in the first instance, the issue of whether Appellant espoused the correct legal standard regarding what constitutes a live birth is moot. Thus, we make no ruling as to the legal correctness of the instruction.

18. Appellant's proposed instruction number twenty-three provides:

The jury is reminded that both the offenses of first degree murder and second degree murder require the State to prove beyond a reasonable doubt that at the time of the alleged offense, Lorie McGuire not only killed the infant, but that she intended to kill the infant. It is the defendant's contention in this case that if the infant was, in fact, killed as a result of thermal burning, then such death was nonintentional, because at the time of the alleged offense she believed that her labor had resulted in a stillborn infant and that her intention was only to burn the remains of such stillborn infant.

Where there has been a denial of an intentional killing, the burden is upon the State to prove that it was intentional; and, if from a consideration of all of the evidence, both that for the State and that for the defendant, there exists a reasonable doubt as to whether at the time of the alleged offense Lorie McGuire had a specific intent to kill the infant, or whether she only intended to dispose of the remains of the infant that she believed to be stillborn, then you may not find Lorie McGuire guilty of murder in either the first degree or the second degree.

*Id.* (citations omitted). Appellant's proposed instruction number twenty-five states:

If you do not find, from all of the evidence and beyond a reasonable doubt, the defendant guilty of murder in either the first or the second degree as contained in the Indictment, then you may consider the lesser-included offense of involuntary manslaughter as contained in the Indictment.

The Court instructs the jury that the offense of involuntary manslaughter is defined as the unlawful and unintentional killing of another person, in the performance of an unlawful act or in the performance of a lawful act in an unlawful manner.

You are further instructed that involuntary manslaughter may be committed as accidental or unintended death of another.

In determining whether Lorie McGuire may be found guilty of the crime of involuntary manslaughter, you are instructed that the act or manner of performance of the act which causes an unintentional death must be an act which is culpable in something more than simple negligence. Before you may find Lorie McGuire guilty of involuntary manslaughter, you must find that the evidence has shown beyond a reasonable doubt that the conduct which resulted in the death, although unintended, was the result of negligence so wanton and culpable as to shown [sic] a reckless disregard of human life."

*Id.* (citations omitted).

19. Due to the length of this instruction, we only quote the relevant portions of it in the text of this opinion.

The relevant portion of the instruction starts by setting forth the essential elements of first degree murder. Then, instead of affirmatively stating the elements of second degree murder and voluntary and involuntary manslaughter, the instruction provides that the prosecution must prove beyond a reasonable doubt the essential elements of first degree murder except for those elements of first degree murder which the trial court declared were unnecessary to establish second degree murder and voluntary and involuntary manslaughter. For instance, with respect to involuntary manslaughter, the instruction states: "In order to convict the defendant of the offense of involuntary manslaughter you must find from the evidence beyond a reasonable doubt each of the above stated essential elements [for first degree murder] except that the killing was unlawful but not feloniously, deliberate, premeditated, maliciously, or that it was intentional." Appellee concedes the syntax of the instruction is unartful, but Appellee maintains it does accurately and adequately covers the essential elements of the crime.

In syllabus point seven of *State v. Barker*, 128 W.Va. 744, 38 S.E.2d 346 (1946), we held "[t]he offense of involuntary manslaughter is committed when a person, while engaged in an unlawful act, unintentionally causes the death of another, or where a person engaged in a lawful act, unlawfully causes the death of another." *Id.; State v. Hughes*, 197 W.Va. 518, 523, 476 S.E.2d 189, 194 (1996); *State v. Hose*, 187 W.Va. 429, 432, 419 S.E.2d 690, 693 (1992). While taking a backwards approach to describing the elements of involuntary manslaughter, we find the instruction sufficiently informed the jury that Appellant was guilty of involuntary manslaughter if the jury found she unlawfully, yet unintentionally, caused her newborn's death. As specifically indicated by the instruction, involuntary manslaughter does not require the death to be caused by an intentional, felonious, deliberate, premeditated, or malicious act. Although a better approach would be for the trial court to affirmatively state the elements of *each* crime, we determine the trial court

did not abuse its discretion by accepting the way Appellee worded the involuntary manslaughter instruction at issue here. *See* Syl. Pt. 6, in part, *Tennant.*

▬▬▬ Upon finding involuntary manslaughter adequately covered in Appellee's instruction number one-A, we also determine the trial court did not err by refusing Appellant's instructions on involuntary manslaughter as it was covered in the charge. *See* Syl. Pt. 20, *Hamric.*[20] Moreover, while Appellant's instruction numbers twenty-three and twenty-five discuss first and second degree murder and involuntary manslaughter, neither instruction mentions voluntary manslaughter, which is what the jury ultimately convicted Appellant of committing. Although Appellant concedes in her brief that she should have amended instruction number twenty-three to reflect the trial court's decision that a voluntary manslaughter instruction was appropriate in this case, Appellant did not offer to amend either instruction at trial. Thus, these instructions represented incomplete statements of the law.

### D.

### *Voluntary Manslaughter*

▬▬▬ Appellant next argues, however, that the trial court erred by finding there was sufficient evidence to support an instruction on voluntary manslaughter and that the instruction given contains an inaccurate statement of the law.[21] As to voluntary manslaughter, Appellee's instruction number one-A provides, in relevant part: "In order to convict the defendant of the offense of voluntary manslaughter you must find from the evidence beyond a reasonable doubt each of the above stated essential elements [for first degree murder] except that the killing was not deliberate, premeditated, or maliciously, but that it was intentional." To put the instruction in affirmative terms, the instruction defines voluntary manslaughter as a willful, intentional, and felonious killing which was not committed with deliberation, premeditation, or malice. Appellant complains

---

**20.** *See supra* note 9.

**21.** Appellant's objection to the instruction is noted in the record.

because the trial court completely failed in this instruction to inform the jury on the "elements" of gross provocation and in the heat of passion. Upon review, we find the trial court's exclusion of these factors does not warrant reversal under the facts of this case.

To begin, we point out that there is no statutory definition of voluntary manslaughter in West Virginia.[22] Thus, we are forced to look to the common law in order to determine the essential elements of the crime. At common law, criminal homicide was divided into two offenses, murder and manslaughter. 5 William Blackstone, *Commentaries* *190. The principal difference between these offenses was said to be that voluntary manslaughter "arises from the sudden heat of the passions," while murder arises "from the wickedness of the heart." *Id.* Blackstone specifically defined manslaughter as "the unlawful killing of another, without malice either express or implied; which may be either voluntary, upon a sudden heat; or involuntary, but in the commission of some unlawful act." *Id.* at *191.[23]

For a modern definition of voluntary manslaughter, Appellant cites *State v. Beegle*, 188 W.Va. 681, 425 S.E.2d 823 (1992), where we stated in a per curiam opinion that "[t]his Court has rather consistently defined voluntary manslaughter as a sudden, intentional killing upon gross provocation and in the heat of passion." *Id.* at 685, 425 S.E.2d at 827.[24] Like Blackstone, this Court has said a "heat of passion engendered by provocation and resulting in an intentional killing cannot be traced to a malignant heart, but it is imputable to human frailty. Passion and malice are not convertible terms, so that an act prompted by the one cannot be said to proceed from the other." *State v. Kirtley*, 162 W.Va. 249, 253–54, 252 S.E.2d 374, 376 (1978) (citations and internal quotations omitted). Importantly, however, in addition to the cursory definition of voluntary manslaughter we set forth in *Beegle*, this Court also has emphasized that *malice* is the critical distinguishing feature between murder and voluntary manslaughter. *Id.* at 254, 252 S.E.2d at 376–77, citing *State v. Starkey*, 161 W.Va. 517, 526, 244 S.E.2d 219, 225 (1978), *overruled on other grounds Guthrie*, 194 W.Va. at 667, 461 S.E.2d at 173.[25] Given this

**22.** To the contrary, West Virginia Code § 61–2–1 (1992) defines first and second degree murder and specifies the form of an indictment for either murder or manslaughter. West Virginia Code § 61–2–1 states:

> Murder by poison, lying in wait, imprisonment, starving, or by any willful, deliberate and premeditated killing, or in the commission of, or attempt to commit, arson, kidnaping, sexual assault, robbery, burglary, breaking and entering, escape from lawful custody, or a felony offense of manufacturing or delivering a controlled substance as defined in article four [§ 60A–4–401 et seq.], chapter sixty-a of this code, is murder of the first degree. All other murder is murder of the second degree.
>
> In an indictment for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which, the death of the deceased was caused, but it shall be sufficient in every such indictment to charge that the defendant did feloniously, willfully, maliciously, deliberately and unlawfully slay, kill and murder the deceased.

*Id.* The penalty for voluntary manslaughter is set forth in West Virginia Code § 61–2–4 (1996 Supp.).

**23.** To illustrate voluntary manslaughter, Blackstone further commented:

> [I]f upon a sudden quarrel two persons fight, and one of them kills the other, this is man-

slaughter: and so it is, if they upon such an occasion go out and fight in a field; for this is one continued act of passion: and the law pays that regard to human frailty, as not to put a hasty and deliberate act upon the same footing with regard to guilt. So also if a man be greatly provoked, as by pulling his nose, or other great indignity, and immediately kills the aggressor, though this is not excusable *se defendendo*, since there is no absolute necessity for doing it to preserve himself; yet neither is it murder, for there is no previous malice: but it is manslaughter.

*Id.* (footnotes omitted).

**24.** Citing *State v. Stalnaker*, 167 W.Va. 225, 279 S.E.2d 416 (1981); *State v. Duvall*, 152 W.Va. 162, 160 S.E.2d 155 (1968); *State v. Bowyer*, 143 W.Va. 302, 101 S.E.2d 243 (1957); *State v. Foley*, 131 W.Va. 326, 47 S.E.2d 40 (1948); *State v. Zannino*, 129 W.Va. 775, 41 S.E.2d 641 (1947); *State v. Barker*, 128 W.Va. 744, 38 S.E.2d 346 (1946).

**25.** See also *State ex rel. Combs v. Boles*, 151 W.Va. 194, 199, 151 S.E.2d 115, 118 (1966) (finding a "homicide, if committed feloniously and unlawfully, but without malice, will constitute voluntary manslaughter"); *State v. Prater*, 52 W.Va. 132, 138, 43 S.E. 230, 232 (1903) (stating "[v]oluntary manslaughter is the intentional tak-

additional emphasis, the question for this Court now to resolve is whether the State carries the burden to prove beyond a reasonable doubt a defendant acted "upon gross provocation and in the heat of passion" in order to convict the defendant of voluntary manslaughter.

This precise issue was addressed three years ago by the United States Court of Appeals for the Ninth Circuit in *United States v. Quintero*, 21 F.3d 885 (9th Cir. 1994). The defendant in *Quintero* was indicted for first degree murder and convicted of voluntary manslaughter as a result of the death of his two-year-old daughter. *Id.* at 888. Relying upon the federal definition of voluntary manslaughter,[26] the defendant appealed his conviction, arguing no evidence was presented that he acted "upon a sudden quarrel or heat of passion" when his daughter was killed and, thus, the government failed to prove an essential element of the crime. *Id.* at 889. The court disagreed and affirmed the defendant's conviction. *Id.* at 895.[27]

In its analysis, the court first observed that, under Rule 31(c) of the Federal Rules of Criminal Procedure,[28] a defendant only may be convicted of an uncharged offense if the elements of the uncharged offense are "necessary included" in the elements of the charged offense. *Id.* at 889 (citations omitted). Thus, the court said voluntary manslaughter, as a lesser included offense of murder, cannot contain elements greater than what is necessary to obtain a murder

conviction. *Id.* In other words, "[t]o require the government to prove sudden quarrel or heat of passion in such circumstances would impermissibly add to the 'subset' of elements that makes up the lesser included offense." *Id.* at 890 (citing *Schmuck v. United States*, 489 U.S. 705, 716, 109 S.Ct. 1443, 1450, 103 L.Ed.2d 734, 746 (1989)). Instead, the court identified sudden quarrel or heat of passion as mitigating factors which are in the nature of a defense, reducing murder to manslaughter. Thus, the court stated that it is *not* the government's burden to "prove the *presence* of sudden quarrel or heat of passion before a conviction for voluntary manslaughter can stand in a murder trial." *Id.* (emphasis original; citing *United States v. Alexander*, 471 F.2d 923, 942–43 (D.C.Cir.1972)).[29]

In West Virginia, there can be no doubt that we also have considered voluntary manslaughter as a lesser included offense of murder. *See generally Guthrie*, 194 W.Va. at 671, 461 S.E.2d at 177 (finding "[t]he jury was charged in this case on the offenses of first and second degree murder and *the lesser-included offenses* of voluntary and involuntary manslaughter" (emphasis added)); Syl. Pt. 1, *State v. Louk*, 169 W.Va. 24, 285 S.E.2d 432 (1981)[30] (declaring the test to be applied to determine if an offense is a lesser included offense of a greater offense)[31]; W. Va.Code § 61–2–1 (providing the definition of first and second degree murder); W. Va. R.Crim. P. 31(c) (containing identical language as federal rule). As a lesser included offense, we agree with the court's conclusion

---

ing of life without malice, without premeditation, without deliberation").

**26.** Voluntary manslaughter is defined by statute as "the unlawful killing of a human being without malice.... [u]pon a sudden quarrel or heat of passion." 18 U.S.C. § 1112(a) (1988).

**27.** The defendant's sentence, however, was vacated on other grounds, and the case was remanded for resentencing. *Id.*

**28.** Rule 31(c) of the Federal Rules of Criminal Procedure states: *"Conviction of less offense.—* The defendant may be found guilty of an offense necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein if the attempt is an offense."

**29.** *Accord Pennsylvania v. Fisher*, 342 Pa.Super. 533, 539, 493 A.2d 719, 722 (1985) (stating that "[e]ither passion or provocation explains why a crime is not murder, but neither is a necessary element of voluntary manslaughter").

**30.** *Overruled on other grounds* Syl. Pt. 6, *State v. Jenkins*, 191 W.Va. 87, 443 S.E.2d 244 (1994).

**31.** Syllabus point one of *Louk* provides:

The test of determining whether a particular offense is a lesser included offense is that the lesser offense must be such that it is impossible to commit the greater offense without first having committed the lesser offense. An offense is not a lesser included offense if it requires the inclusion of an element not required in the greater offense.
*Id.*

in *Quintero* and hold that gross provocation[32] and "heat of passion are ... not essential elements of voluntary manslaughter, and therefore, they need not be proven by evidence beyond a reasonable doubt." *Quintero*, 21 F.3d at 891 (citation and footnote omitted). It is intent without malice, not heat of passion, which is the distinguishing feature of voluntary manslaughter. *Id.*[33] Generally speaking, with respect to an unlawful killing, "[i]f malice is proven, the crime becomes second [or first] degree murder; if

intent is not proven, the crime becomes involuntary manslaughter." *Id.* at 890 (citations and footnote omitted).[34]

▮ Thus, concluding a defendant can be convicted of voluntary manslaughter without the State proving beyond a reasonable doubt the defendant acted upon gross provocation and in the heat of passion, the final determination for this Court to make is whether there is sufficient evidence to support the jury's verdict. Viewing the evidence in a light most favorable to the prosecution,[35] we

---

**32.** Any distinctions which may be said to exist between the federal use of the phrase "sudden quarrel" and our use of the phrase "gross provocation" are insignificant to the specific issue presented in this case.

**33.** *Cf. Kirtley,* 162 W.Va. at 254, 252 S.E.2d at 376–77 (stating malice is the "critical distinction between murder and voluntary manslaughter").

**34.** Although we need not proceed any further under the facts of the present case, the *Quintero* court also held that, "[o]nce ... evidence is raised, the burden is on the government to prove beyond a reasonable doubt the *absence* of sudden quarrel or heat of passion before a conviction for murder can be sustained." 21 F.3d at 890 (emphasis original; citations omitted). In making this statement, *Quintero* relied, in part, upon the Supreme Court's decision in *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), where the Supreme Court ruled on the constitutionality of a Maine practice requiring a murder defendant "to prove that he acted 'in the heat of passion on sudden provocation' in order to reduce the homicide to manslaughter." *Id.* at 684–85, 95 S.Ct. at 1882–83, 44 L.Ed.2d at 511. The Supreme Court found this practice improperly shifted the burden of proof to a defendant and held the Due Process Clause of the Fourteenth Amendment "requires the prosecution to prove beyond a reasonable doubt the absence of the heat of passion on sudden provocation when the issue is properly presented in a homicide case." *Id.* at 701, 704, 95 S.Ct. at 1890–92, 44 L.Ed.2d at 520–22.

Some courts, however, have recognized the holding in *Mullaney* was limited by the subsequent Supreme Court case of *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). *See, e.g., Fagon v. Bara,* 717 F.Supp. 976 (E.D.N.Y.1989); *Minnesota v. Christie,* 506 N.W.2d 293 (Minn.1993). In *Patterson,* the Supreme Court reviewed a New York criminal law which created an affirmative defense to murder upon a showing of an "extreme emotional disturbance." *Id.* at 198, 97 S.Ct. at 2320, 53 L.Ed.2d at 284. The Supreme Court held that, because the New York law established an affirmative defense which did "not serve to negative any facts of the crime which the State is to prove in order

to convict of murder," the law did not violate the Due Process Clause. *Id.* at 206–07, 97 S.Ct. at 2325, 53 L.Ed.2d at 290. The Supreme Court also stated that it was unnecessary in *Mullaney* to go any further than to declare "a State must prove every ingredient of an offense beyond a reasonable doubt, and that it may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense." *Id.* at 215, 97 S.Ct. at 2329, 53 L.Ed.2d at 295.

· In his dissent to *Patterson,* the Honorable Lewis F. Powell, Jr., Justice, who authored *Mullaney,* remarked that the majority's opinion "manages to run a constitutional boundary line through the barely visible space that separates Maine's law from New York's." *Id.* at 221, 97 S.Ct. at 2332, 53 L.Ed.2d at 298–99 (Powell, J. dissenting). According to Justice Powell, the majority apparently distinguished *Patterson* from *Mullaney* on the basis that Maine's definition of murder included the element of "malice," while New York's definition merely included an intent to kill and permitted a defendant to raise an affirmative defense of an "extreme emotional disturbance." *Id.* at 221–22, 97 S.Ct. at 2332–33, 53 L.Ed.2d at 299. By permitting such a factor to be couched in terms of an "affirmative defense," Powell believed the majority's opinion would "allow[ ] a legislature to shift, virtually at will, the burden of persuasion with respect to any factor in a criminal case, so long as it is careful not to mention the nonexistence of that factor in the statutory language that defines the crime." *Id.* at 223, 97 S.Ct. at 2333, 53 L.Ed.2d at 300. *See also Engle v. Isaac,* 456 U.S. 107, 120, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783, 795 (1982) (stating "[o]ur opinions suggest that the prosecution's constitutional duty to negate affirmative defenses may depend, at least in part, on the manner in which the State defines the charged crime").

**35.** In syllabus point one of *Guthrie,* we said:

The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defen-

find such evidence exists. Clearly, the evidence presented at trial supports Appellee's theory that Appellant committed an intentional, unlawful killing. Although Appellant maintained she thought the baby was dead at birth, by its verdict, the jury obviously did not believe her testimony. Given the conclusive medical evidence showing the baby definitely was alive and suffered from no *in utero* distress, the jury certainly was justified in finding Appellant intentionally killed the baby when she placed her in the woodstove. However, there also was sufficient evidence presented for the jury to find Appellant did not kill the baby maliciously; rather, she killed the baby because she believed it was the best thing to do under the circumstances. Ms. Mangino testified that Appellant told her the baby would be "fucked up" and no one would want the child because Appellant took birth control pills and consumed alcohol while pregnant.[36] Moreover, as Appellant never revealed to her parents she was pregnant prior to the birth and Appellant clearly did not want to raise the baby herself, the jury easily could have concluded the baby was not killed maliciously but because Appellant saw killing the baby as her only option.[37] Therefore, as sufficient evidence exists to support Appellant's conviction of voluntary manslaughter, we decline to disturb the jury's verdict.

## III.

### CRITICAL STAGE

■ Appellant next argues she was deprived of her right to be present at a critical stage of the proceedings when the prosecuting attorney failed to notify defense counsel of, or serve defense counsel with a copy of, a petition to exhume the baby's body for a second autopsy. Appellant claims she did not become aware of the petition or the trial court's authorization of the exhumation until after the baby was exhumed and transported to Morgantown for the autopsy to be performed. Appellant maintains that, if Appellee had given her notice when the petition was filed, she would have challenged the trial court's authority to order the exhumation and, thereby, prevented the exhumation from occurring. Appellant moved the trial court to suppress the results of the second autopsy, but her motion was denied.

■ The right to be present or be represented by counsel at a critical stage proceeding is guaranteed by Article III, Section 14 of the West Virginia Constitution and the Fifth and Sixth Amendments to the United States Constitution. *See Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353, 356 (1970); *Snyder v. Massachusetts*, 291 U.S. 97, 106–08, 54 S.Ct. 330, 332–33, 78 L.Ed. 674, 678–79 (1934)[38]; *State v. Crabtree*, 198 W.Va. 620, 629, 482 S.E.2d 605, 614 (1996); Syl. Pt. 6, *State v. Boyd*, 160 W.Va. 234, 233 S.E.2d 710 (1977). This Court has defined a critical stage as "a criminal proceeding ... where the defendant's right to a fair trial will be affected." Syl. Pt. 2, *State v. Tiller*, 168 W.Va. 522, 285 S.E.2d 371 (1981). We also have said if a defendant is not present at a critical stage "the State is required to prove beyond a reasonable doubt

dant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

*Id.* When a criminal defendant complains on appeal that the evidence presented below was insufficient to support a conviction, the appellate court "must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution." Syl. Pt. 3, in part, *Guthrie*. It is for the jury, not an appellate court, to determine credibility. An appellate court should set aside a jury verdict "only when the record contains no evidence, regardless of how it is weighed, from which the

jury could find guilt beyond a reasonable doubt." *Id.*

36. *See supra* note 4.

37. In addition, psychiatric testimony at trial described Appellant as an extremely passive and submissive person, who at the time she committed the act, was unable to distinguish right from wrong. Friends and family testified Appellant was a loving, gentle, and peaceful person who takes excellent care of her then two-year-old daughter.

38. *Overruled on other grounds Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

that what transpired in his absence was harmless." Syl. Pt. 6, in part, *Boyd; see also* Syl. Pt. 3, *State ex rel. Redman v. Hedrick,* 185 W.Va. 709, 408 S.E.2d 659 (1991) (declaring "[i]n a criminal proceeding, the defendant's absence at a critical stage of such proceeding is not reversible error where no possibility of prejudice to the defendant occurs").[39]

Rule 43 of the West Virginia Rules of Criminal Procedure further secures a defendant's right to be present.[40] However, it also states the presence of a defendant is not required when, inter alia, a conference or argument concerns "a technical question of law not depending upon facts within the per-

sonal knowledge of the defendant." W. Va. R.Crim. P. 43(c)(3). Clearly, in this case, the trial court's order permitting the baby to be exhumed for a second autopsy to be performed (because the first autopsy was considered to be incomplete) fell within this exception and it did not deprive Appellant of her right to a fair trial.[41]

## IV.

## CREDIT FOR TIME SERVED

In her last assignment of error, Appellant asserts she should be given credit for time that she spent on home confinement while released on pretrial bail.[42] We recent-

39. Of course, a defendant can waive his or her right to present by voluntarily being absent from a proceeding. *Taylor v. United States,* 414 U.S. 17, 19–20, 94 S.Ct. 194, 195–96, 38 L.Ed.2d 174, 177–78 (1973) (per curiam); W. Va. R.Crim. P. 43(b)(1) (providing, in part, a "defendant shall be considered to have waived the right to be present whenever a defendant, initially present: (1) Is voluntarily absent after the trial has commenced . . . .").

40. In relevant part, Rule 43 of the West Virginia Rules of Criminal Procedure provides:

> (a) *Presence required.*—The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.
> . . . .
> (c) *Presence not required.*—A defendant need not be present in the following situations:
> . . . .
> (3) At a conference or argument upon a technical question of law not depending upon facts within the personal knowledge of the defendant.
> *Id.*

41. Moreover, even if we were to consider the event a critical stage, we disagree with Appellant's legal analysis that the trial court erred by issuing the order. Appellant contends that, pursuant to West Virginia Code § 61–12–11 (1992), a trial court only may order an exhumation when a "sudden, violent or suspicious death" occurs and the deceased was "buried without any investigation by . . . a medical examiner . . . ." W. Va.Code § 61–12–11. As the first autopsy was performed by Dr. Renedo, a medical examiner, Appellant asserts the trial court had no authority to exhume the body for a second autopsy. In relevant part, West Virginia Code § 61–12–11 provides:

> If, in any case of sudden, violent or suspicious death, the body is buried without any investigation by the chief medical examiner, or by a medical examiner, it shall be the duty of the medical examiner, upon being advised of such fact, to notify the prosecuting attorney of such county, who shall communicate the same to the judge of the circuit court or other court of record having jurisdiction in such county, and such judge may order that the body be exhumed and an autopsy performed thereon, as provided in section ten [§ 61–12–10] of this article . . . .

*Id.* Although this statute creates an affirmative duty on the part of a medical examiner to initiate an investigation in cases of "sudden, violent or suspicious" deaths which previously have not been investigated, the statute does not prohibit a court from issuing an order of exhumation under other circumstances. Indeed, as we discussed in dicta in *State v. Highland,* 71 W.Va. 87, 76 S.E. 140 (1912), "the trial court in proper cases of imperative necessity has inherent power to order disinterment of a body in trials for murder to ascertain the truth respecting the homicide, in due administration of justice . . . ." 71 W.Va. at 91, 76 S.E. at 141 (citation omitted). *See also* W. Va.Code § 61–12–10 (1992) (authorizing a circuit court judge to request an autopsy be made); 22A Am.Jur.2d *Dead Bodies* § 78, at 51 (1988) (stating "[i]n a prosecution for homicide, the exhumation of the victim's remains may be ordered upon the application of the state or of the defendant where it appears to be absolutely essential to the administration of justice"); Annotation, *Disinterment in criminal cases,* 63 A.L.R.3d 1294, 1298 (1975) (expressing "when the sanctity of sepulture is measured and weighed against the right and obligation to provide vital evidence tending either to prove or to disprove the innocence of a person charged with a serious criminal offense, the communal interests of the people should prevail so as to allow exhumation").

42. Initially, the circuit court denied Appellant's request for pretrial bail. By order dated May 31,

ly addressed this precise issue in *State v. Hughes*, 197 W.Va. 518, 476 S.E.2d 189 (1996), where we determined in syllabus point four:

> When a person who has been arrested, but not yet convicted of a crime, is admitted to pre-trial bail with the condition that he be restricted to home confinement pursuant to West Virginia Code § 62–1C–2(c) (1992), the home confinement restriction is not considered the same as actual confinement in a jail, nor is it considered the same as home confinement under the Home Confinement Act, West Virginia Code §§ 62–11B–1 to –12 (1993). Therefore, the time spent in home confinement when it is

a condition of bail under West Virginia Code § 62–1C–2(c) does not count as credit toward a sentence subsequently imposed.

*Id.*[43] In making our decision in *Hughes,* we recognized that the Home Confinement Act §§ 62–11B–1 to –12 (1992 & Supp.1993)[44] (hereinafter the Act) only applies to "offenders" and a defendant awaiting trial on pretrial bail is not an "offender" as defined in the Act. 197 W.Va. at 528, 476 S.E.2d at 199.[45] We also found there were numerous mandatory restrictions placed on a defendant being awarded home confinement under the Act,[46] but such restrictions are not required

---

1995, we directed the circuit court to release Appellant on a $150,000 bond, "conditioned upon home confinement under such terms and conditions as are ordinarily imposed in Marshall County...." Appellant was convicted of voluntary manslaughter on December 5, 1995.

**43.** *Cf.* Syl. Pt. 3, in part, *State v. Lewis*, 195 W.Va. 282, 465 S.E.2d 384 (1995) (holding "[u]nder the probation statute ..., home incarceration is not considered the same as actual confinement in a county jail").

**44.** The 1993 version of the "Home Confinement Act" applied to the facts of *Hughes.* In 1994, the Act was redesignated as the "Home Incarceration Act" and the word "incarceration" was substituted for the words "confinement" and "detention" throughout the Act. *See* W. Va.Code § 62–11B–1 to –12 (Supp.1996); *see* 197 W.Va. at 525 n. 9, 476 S.E.2d at 196 n. 9. Although Appellant in the present case was released on pretrial bail on June 2, 1995, the trial court utilized the phrase "home confinement." As we find the Act did not apply to Appellant, and for the sake of consistency, we continue to use that phrase in our discussion.

**45.** *See* W. Va.Code § 62–11B–2 (1992) (stating, in part, "[t]his article applies to adult offenders ... "); W. Va.Code § 62–11B–3 (1992) (defining an "offender" as "any adult convicted of a crime punishable by imprisonment or detention in a county jail or state penitentiary ..."). However, we recognized "[i]t is undeniable that the Act provides that home confinement can be a condition of bail...." *Id.* at 526, 476 S.E.2d at 197 (quoting W. Va.Code § 62–11B–4(a) (Supp.1993) which provides, in part: "As a condition of ... bail ... a circuit court may order an offender confined to the offender's home for a period of home confinement").

**46.** Pursuant to West Virginia Code § 62–11B–5 (Supp.1993), a trial court is required to impose

certain conditions upon an individual granted home confinement. This section provides:

> An order for home confinement of an offender under section four [§ 62–11B–4] of this article *shall include,* but not be limited to, the following:
> (1) A requirement that the offender be confined to the offender's home at all times except when the offender is:
> (A) Working at employment approved by the circuit court or magistrate, or traveling to or from approved employment;
> (B) Unemployed and seeking employment approved for the offender by the circuit court or magistrate;
> (C) Undergoing medical, psychiatric, mental health treatment, counseling or other treatment programs approved for the offender by the circuit court or magistrate;
> (D) Attending an educational institution or a program approved for the offender by the circuit court or magistrate;
> (E) Attending a regularly scheduled religious service at a place of worship;
> (F) Participating in a community work release or community service program approved for the offender by the circuit court;[ ] in circuit court cases; or
> (G) Engaging in other activities specifically approved for the offender by the circuit court or magistrate.
> (2) Notice to the offender of the penalties which may be imposed if the circuit court or magistrate subsequently finds the offender to have violated the terms and conditions in the order of home detention.
> (3) A requirement that the offender abide by a schedule, prepared by the probation officer in circuit court cases; or by the supervisor or sheriff in magistrate court cases, specifically setting forth the times when the offender may be absent from the offender's home and the locations the offender is allowed to be during the scheduled absences.
> (4) A requirement that the offender is not to commit another crime during the period of

under the statutory scheme regarding bail.[47] *Id.* Nevertheless, Appellant asserts that, because the restrictions placed on her correspond with some of the restrictions under the Act,[48] her case is distinguishable from *Hughes* and, therefore, she should be awarded credit. We disagree.

First, like *Hughes,* Appellant was not convicted of any offense when she was placed on home confinement. Thus, Appellant was not an "offender" under the Act and the Act did not apply to her. Second, under the facts of this case, we find it inconsequential that the conditions imposed upon Appellant as a part of her home confinement coincided with some of the mandatory requirements as set forth in the Act. A circuit court is granted wide discretion in formulating bail in order to secure " 'the appearance of a defendant to answer to a specific criminal charge....' " *Id.* at 528, 476 S.E.2d at 199 (quoting W. Va.Code § 62–1C–2 (1992); other citations omitted).[49] Here, the circuit court's order basically provided that Appellant was to be electronically monitored, as administered by a probation officer, and Appellant only could

leave her house in order to attend church; consult with her attorney; or receive medical, psychiatric, or psychological treatment.[50] Not only does this order fail to cover all the requirements imposed by the Act,[51] but we also find the circuit court clearly acted within its discretion by imposing these basic requirements as part of Appellant's home confinement in order to secure her presence at trial.[52] Therefore, under *Hughes,* we conclude that Appellant is not entitled to credit for the time she spent at home while awaiting her trial.

## V.

## CONCLUSION

In sum, we find it was not error for the trial court to accept Appellee's instructions on voluntary and involuntary manslaughter over those offered by Appellant. We also determine Appellant was not deprived of her right to be present at a critical stage of the proceedings and was not entitled to time served while released on home confinement as a condition of her pretrial bail.[53] There-

home confinement ordered by the circuit court or magistrate.

(5) A requirement that the offender obtain approval from the probation officer or supervisor or sheriff before the offender changes residence or the schedule described in subdivision (3) of this section.

(6) A requirement that the offender maintain:

(A) A working telephone in the offender's home;

(B) If ordered by the circuit court or as ordered by the magistrate, an electronic monitoring device in the offender's home, or on the offender's person, or both; and

(C) Electric service in the offender's home if use of a monitoring device is ordered by the circuit court or anytime home confinement is ordered by the magistrate.

(7) A requirement that the offender pay a home confinement fee set by the circuit court or magistrate. If a magistrate orders home confinement for an offender, the magistrate shall follow a fee schedule established by the supervising circuit judge in setting the home incarceration fee.

(8) A requirement that the offender abide by other conditions set by the circuit court or by the magistrate.

W. Va.Code § 62–11B–5 (emphasis added).

**47.** *See* W. Va.Code §§ 62–1C–1 to –19 (1992 and Supp.1996).

**48.** *See supra* note 46.

**49.** *See* W. Va.Code § 62–1C–2 (stating, in part, that bail may take "[s]uch other form as the judge of the court that will have jurisdiction to try the offense may determine").

**50.** The order also provided Appellant must pay for her electronic monitoring.

**51.** *See* W. Va.Code § 62–11B–5, *supra* note 46.

**52.** Moreover, in this Court's May 31, 1995 order, we directed the trial court to impose Appellant's home confinement upon "such terms and conditions as are ordinarily imposed in Marshall County...." *See supra* note 42. There is no contention that the conditions imposed upon Appellant were out of the ordinary.

**53.** We find no merit to Appellant's argument that she was denied the opportunity to present evidence from Jonathan Himmelhock, M.D., a psychiatrist testifying on behalf of Appellant, who would have said Appellant suffered from diminished capacity making her unable to formulate a specific intent to kill. Before Dr. Himmelhock began testifying, the trial court granted Appellee's motion prohibiting Dr. Himmelhock from discussing diminished capacity. Nevertheless, our review of the record shows Dr. Himmelhock actually presented such evidence to the jury by virtue of Appellee's acquiescence while he was

fore, for the foregoing reasons, we affirm the final order of the Circuit Court of Marshall County.

Affirmed.

testifying. For instance, Dr. Himmelhock described Appellant as "psychotic," "disorganized," "unable to conform her behaviors to the requirements of law," and unable "to differentiate between right and wrong." Dr. Himmelhock testified that the behaviors of women who are giving birth while in denial of their pregnancies are reported in the literature to be "automatic and arrived at by the immediate stimulus in the environment, not through a pattern of thought and forethought. The idea of planning and forethought is just not possible in this state." In regard to Appellant, Dr. Himmelhock similarly opined she was unable to understand the consequences of her actions and her "actions were chained to the stimuli as they followed one another." Dr. Himmelhock also testified he was "of the strong opinion that ... [Appellant] felt that the baby was dead." Given this testimony, we find Appellant generally was unaffected by the trial court's ruling. In addition, we find the trial court did not abuse its discretion in denying Appellant's related instruction numbers twenty-nine and thirty. Both of these instructions generally are covered by the jury charge. Moreover, instruction number thirty emphasizes the intent necessary for first and second degree murder, but it completely fails to mention voluntary manslaughter. Appellant made no motion to amend this instruction.